UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MAIDEN BIOSCIENCES, INC. | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| DOCUMENT SECURITY SYSTEMS, | § | |
| INC., DECENTRALIZED SHARING | § | |
| SYSTEMS, INC., HWH WORLD, INC. | § | |
| F/K/A/ BLISS INTERNATIONAL, INC., | § | |
| RBC LIFE SCIENCES, INC., RBC LIFE | § | |
| INTERNATIONAL, INC., FRANK D. | § | |
| HEUSZEL, STEVEN E. BROWN, | § | |
| CLINTON HOWARD, and ANDREW | § | |
| HOWARD | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF MAIDEN BIOSCIENCES, INC.'S ORIGINAL COMPLAINT**

Plaintiff, Maiden Biosciences, Inc. ("Maiden"), by its undersigned attorneys, Bell Nunnally & Martin LLP, files this Complaint against Defendants Document Security Systems, Inc. ("DSS"), Decentralized Sharing Systems, Inc. ("Decentralized"), HWH World, Inc. f/k/a Bliss International, Inc. ("HWH"), RBC Life Sciences, Inc. ("RBC"), RBC Life International, Inc. ("RBC International"), Frank D. Heuszel ("Heuszel"), Steven E. Brown ("Brown"), Clinton Howard, and Andrew Howard, and in support thereof alleges as follows:

**I. INTRODUCTION**

1.      The Defendants conspired and formed the textbook example of a fraudulent scheme to profit from a company's desired assets while simultaneously manipulating mandatory public disclosures and cheating the acquired company's creditors. DSS was looking to expand and set up a multi-level market in Asia, and RBC was facing insolvency and a mountain of debt. Defendants

devised a scheme whereby in October 2019, DSS paid nothing to take control of all of at least $7,500,000 of RBC's assets, including its infrastructure domestically and in multiple Asian markets. DSS began using RBC's assets as if RBC has simply merged into the DSS umbrella. Defendants subsequently executed convertible promissory notes, stock sales, and foreclosure sales to give paper legitimacy to the transfer of control.

2.      Instead of valid loans, these arrangements were designed to give the sheen of legitimacy to RBC moving its assets under the DSS umbrella in exchange for nothing; to avoid RBC's looming creditors, including Maiden. RBC even admitted there was never an intent to pay back the "loans" and that it received nothing in return for transferring its assets to DSS. As a result of the scheme, RBC is now a shell company with nothing for its multiple creditors. Apparently, the ruse was structured in a very particular way to allow DSS, a publicly traded company, to manipulate its SEC disclosure obligations.

3.      Maiden requests that this Court enter a judgment against Defendants, jointly and severally, sufficient to punish Defendants' fraudulent, criminal enterprise.

## II. PARTIES

4.      Plaintiff Maiden Biosciences, Inc. is a Maryland corporation with its principal place of business in Montgomery County, Maryland.

5.      Defendant Document Security Systems, Inc. is a New York corporation with its principal place of business in Monroe County, New York, that may be served with process through its Chief Executive Officer, Frank D. Heuszel, 200 Canal View Blvd., Suite 104, Rochester, NY 14623.

6.      Defendant Decentralized Sharing Systems, Inc. is a Nevada corporation with its principal place of business in Clark County, Nevada, that may be served with process through its

registered agent, LEGALCORP SOLUTIONS, LLC, 2831 St. Rose Parkway Suite 200-400, Henderson, NV, 89052.

7.     Defendant HWH World, Inc. f/k/a Bliss International, Inc. is a Texas corporation with its principal place of business in Monroe County, New York, that may be served with process through its registered agent, National Registered Agents, Inc., 1999 Bryan St., Suite 900, Dallas, TX 75201.

8.     Defendant RBC Life Sciences, Inc. is a Texas corporation with its principal place of business in Dallas County, Texas, that may be served with process through its registered agent, CT CORPORATION SYSTEM, 1999 Bryant St., Suite 900, Dallas, TX 75201.

9.     Defendant RBC Life International, Inc. is a Nevada corporation with its principal place of business in Clark County, Nevada, that may be served with process through its registered agent, LEGALCORP SOLUTIONS, LLC, 2831 St. Rose Parkway Suite 200-400, Henderson, NV, 89052.

10.     Upon information and belief, Defendant Frank D. Heuszel is a resident and/or citizen of the State of New York, and may be served with process at 200 Canal View Blvd., Suite 104, Rochester, NY 14623, or wherever he may be found.

11.     Defendant Steven E. Brown is an individual residing in Collin County, Texas, and may be served with process at 1700 Carmel Drive, Plano, TX 75075, or wherever he may be found.

12.     Defendant Clinton Howard is an individual residing in Dallas County, Texas, and may be served with process at 3917 Fox Glen Dr., Irving, TX 75062, or wherever he may be found.

13.     Defendant Andrew Howard is an individual residing in Tarrant County, Texas, and may be served with process at 950 E. State Highway 114, Suite 160, Southlake, TX 76092, or wherever he may be found.

## III. JURISDICTION AND VENUE

14.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1332 and 18 U.S.C. § 1964 because Maiden's claims for violations of 18 U.S. Code § 1962 arise under federal law. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Maiden's state law claims because those claims are so related to the federal claims that they form part of the same case or controversy. Jurisdiction in this Court is also proper under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

15.     This Court has personal jurisdiction over Defendants Steven E. Brown, Clinton Howard, Andrew Howard, HWH and RBC because they are residents of Texas.

16.     This Court has personal jurisdiction over Defendants Frank D. Heuszel, DSS, Decentralized, and RBC International pursuant to the Texas long-arm statute.[1] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041-.045. These Defendants "purposefully established" minimum contacts with Texas, *inter alia,* by: (1) performing in Texas and (2) entering various transfers to acquire Texas corporation RBC and assuming control of RBC, which is the subject matter of this lawsuit, in Texas. These Defendants have purposefully established continuing and systematic contacts in Texas, and the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. These Defendants have continuously availed themselves of the benefits of a Texas forum.

---

[1] The Texas long-arm statute permits Texas courts to exercise jurisdiction over a nonresident that does business in Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042. The Texas long-arm statute defines "doing business" as (1) contracting by mail or otherwise with a Texas resident with performance either in whole or in part in Texas, (2) commission of a tort in whole or in part in Texas, (3) recruitment of Texas residents, directly or through an intermediary located in Texas, or (4) performance of any other acts that may constitute doing business. *Id.*

17.     Pursuant to 28 U.S.C. § 1391, venue is proper in the United States District Court for the Northern District of Texas, Dallas Division, because a substantial part of the events or omissions giving rise to the claims occurred in Dallas County, Texas.

### IV. FACTS

*Maiden's Lawsuit Against RBC.*

18.     Maiden manufactures medical devices.

19.     On or around September 2, 2016, Maiden entered into a Supply Agreement with MPM Medical, Inc. ("MPM"), a subsidiary of RBC, establishing an exclusive relationship of Maiden as supplier of medical devices and a minimum amount of units that MPM must order on a yearly basis during the term of the Supply Agreement.

20.     MPM breached the Supply Agreement, and on October 16, 2017, Maiden filed a lawsuit against MPM and RBC for breach of the Supply Agreement and unjust enrichment (the "Maiden Lawsuit").

*RBC's Insolvency and Efforts to Sell its Assets.*

21.     By mid-2019, while Maiden's lawsuit was pending, RBC became insolvent because it could not pay its debts and was losing money. RBC had substantial liabilities with creditors including Digital Media Group – US LLC ("Digital Media") and Blue Elephant Financing LLC ("Blue Elephant") and was facing Maiden's pending lawsuit for over four million dollars.

22.     RBC began marketing itself to sell its assets. Brown, Clinton Howard, and Andrew Howard met with several companies who made offers to purchase RBC's assets. During this process, RBC negotiated with at least three potential buyers who valued RBC's assets between $7,500,000 and $12,000,000.

*Negotiations with DSS and Heuszel.*

23.     In mid-2019, Andrew Howard connected with Robert B. Bzdick, and Robert B. Bzdick informed of an investor, Heng Fai Chan, who was looking to set up a multi-level market in Asia. Specifically, Heng Fai Chan is an investor in DSS, and Robert B. Bzdick recommended that RBC could be the vehicle for DSS to reach the Asian market.

24.     Beginning in or around August 2019, Brown, Clinton Howard, and/or Andrew Howard began negotiations with Heuszel for DSS to acquire RBC. At this time, RBC was insolvent and unable to pay its debts as they became due.

25.     In July 2019, DSS and Decentralized, a subsidiary of DSS, entered a consulting arrangement with David Price. Initially, David Price was hired to consult DSS on his expertise in direct sales in international markets. In October 2019, this role transitioned to David Price becoming a titular "lender representative" for DSS in its dealings with RBC. In fact, Price's role was to be a figure head in a scheme for DSS to acquire RBC under a structure that was planned to allow DSS to profit from RBC's assets without having to contend with its liabilities, described *infra*.

*DSS Takes Over the Operations of RBC without Paying a Dime*

26.     DSS formed several subsidiaries to take over RBC's assets in the summer and fall of 2019, including RBC International, Decentralized, and Bliss International, Inc. (now known as HWH). RBC International was formed in November 2019 to continue the ongoing business of RBC and sell RBC's products under the DSS umbrella. Bliss International, Inc. was formed in October 2019 to start a new direct sales company utilizing, at least in part, RBC's products.



27.     In October 2019, DSS, through its subsidiaries, took complete control of RBC's assets, including, but not limited to:

    a.     inventory with a market value of $4-$5 Million;

    b.      a distributor network, comprising 5,802 distributors, in the U.S. responsible for more than $1,272,600 per year in revenue;

    c.     RBC's bank accounts;

    d.     RBC's trademarks;

    e.     product formulas;

    f.     patent; and

    g.     everything else required to take over RBC's operations.

28.     In addition to assuming control of these items, DSS took possession of RBC's physical assets and the company records relating to the property and business operations.

29.     Around the same time, DSS assigned Price – who was already serving as a consultant for DSS in direct sales in international markets – to begin consulting with RBC and its subsidiaries pursuant to a subsequent consulting agreement. DSS named Price as acting CEO for

RBC and RBC's subsidiary, RBC Life Sciences USA, Inc. ("RBC USA"), and Price took over operations for both companies. However, once Price began serving as RBC and RBC USA's acting CEO, his compensation came directly from RBC and RBC USA. When RBC International (a DSS subsidiary) was formed one month later, Price was named its President, Secretary, Treasurer, and Director.

30.     No consideration of any kind was provided for this transfer of control, and RBC never received anything in return. Instead, beginning on September 25, 2019 and continuing through at least September 15, 2020, DSS transferred money back and forth between its bank account, its subsidiaries' HWH and RBC International's bank accounts, and RBC USA's bank account (which had been under DSS's complete control since October 2019) solely to fund its operations of RBC USA.

*The Decentralized Note*

31.     DSS's primary desire was to simply merge RBC into DSS, but DSS was hesitant because RBC's debt situation was dire. DSS proceeded with simply moving all of the operations into its umbrella without documenting any deal. DSS then proceeded to attempt to negotiate with some of RBC's primary secured creditors, including Blue Elephant and Digital Media.

32.     DSS's backup plan was a loan to own scheme in the event it could not get acceptable resolutions with RBC's creditors.

33.     On October 9, 2019, RBC entered a promissory note with Decentralized, on behalf of DSS, as Borrower, for $200,000 (the "Decentralized Note"). Brown, as CEO, executed the Note on behalf of RBC.

34.     The Decentralized Note was due only one month later on November 11, 2019.

35.     Simultaneously, Brown, on behalf of RBC and RBC USA, and Heuszel, on behalf of Decentralized and effectively DSS, entered a security agreement whereby all of RBC's $7,500,000 to $12,000,000 in assets were pledged as collateral for the $200,000 loan (the "Decentralized Security Agreement").

36.     The proceeds of the Decentralized Note were not ever actually transferred to RBC. Instead, DSS transferred funds into the RBC operating account, which was already under the control of DSS. More importantly, no one involved believed RBC could or ever intended to pay back the Decentralized Note when it was due a month later or at any point.

37.     Heuszel, Brown, Andrew Clinton, and Howard Clinton knew that RBC, in its current position of insolvency, would be unable to repay the Decentralized Note. The Decentralized Note permitted DSS to either convert the loan into RBC equity or to foreclose on the loan and take all of RBC's assets. Heuszel, Brown, Andrew Clinton, and Howard Clinton's original plan was the former, whereby the Decentralized Note (and later the Bliss Note) would be converted into stock so that RBC would become partly owned by DSS and allow RBC's stockholders to retain some of their ownership in RBC.

*The Bliss Note*

38.     On November 11, 2019, the date the Decentralized Note matured, Heuszel, on behalf of Bliss International, Inc. (n/k/a HWH) and effectively DSS, and Brown, on behalf of RBC, RBC USA, and RBC Subsidiaries[2], entered a second note purporting to offer RBC an $800,000 line of credit (the "Bliss Note").

---

[2] RBC Life Sciences Hong Kong Limited, RBC Life Sciences SDN. BHD., RBC Life Sciences USA, Inc. Taiwan Branch, RBC Life Malaysia, Crown Medical, Inc., PT Arbici Indonesia, RBC Life Asia Pacific Corporation, and RBC Asia Pacific Pte Ltd. (collectively, the "RBC Subsidiaries").

39.     Likewise, Heuszel, on behalf of Bliss International, Inc. (n/k/a HWH) and effectively DSS, and Brown, on behalf of RBC, RBC USA, and the RBC Subsidiaries, entered a security agreement whereby all of RBC's assets were pledged as collateral for the agreement (the "Bliss Security Agreement").

40.     RBC USA and the RBC Subsidiaries entered a Guaranty guaranteeing RBC's obligations to Bliss International, Inc. with respect to the Bliss Note and the Bliss Security Agreement.

41.     The Bliss Note was structured as a convertible and/or demand note, which meant that Bliss, on behalf of DSS, could convert the note to equity in RBC at any point or simply make demand for immediate repayment.

42.     Based on information gathered to date, DSS funded less than $200,000 under the Bliss Note. But, again, those funds went to the RBC operating account over which DSS had already assumed control. As a result, none of the funds actually ever went to RBC, but instead were used by DSS to fund the operations of its new de facto subsidiary.

*The Loan to Own Scheme Comes to Fruition*

43.     As of late 2019, RBC's assets were worth between $7,500,000 and $12,000,000.

44.     Although by November 7, 2019, DSS had assumed control of RBC, it was still trying to contend with RBC's secured creditors - Digital Media and Blue Elephant - that were in hot pursuit of RBC's assets. DSS claims to have attempted to negotiate with those creditors, but the negotiations failed. DSS admits it never attempted to negotiate with Maiden, even though Maiden was heading toward judgment in a lawsuit filed against RBC and related entities at that time. In fact, by December 2019, Heuszel, Brown, and Andrew Howard agreed to allow the Maiden lawsuit to enter default.

45.     Because an official merger at that point would result in DSS being forced to contend with RBC's creditors, Heuszel and DSS abandoned the original plan to convert the Decentralized Note and the Bliss Note to equity ownership.

46.     Instead, Heuszel, with David Price as acting CEO (the same David Price that was also the lender representative for DSS and president of DSS's new subsidiary RBC International) started documenting asset transfers to DSS.

47.     On December 3, 2019, Brown and Price, on behalf of RBC, and Jason Grady (Chief Operating Officer of DSS), on behalf of RBC International, executed a Consulting Services Agreement where RBC agreed to provide RBC International its operational, service, marketing, inventory management, accounts receivable merchant processing, inventory storage, logistical support, and other general multilevel marketing support services to RBC International. Something RBC had been doing for free for DSS since October.

48.     RBC also "sold" 100% of RBC USA's Capital Stock to RBC International for the alleged payment of $200,000. RBC USA was the primary asset of RBC and likely worth more than $7,500,000 in December 2019. Based on information provided to date, there is no evidence the $200,000, or any actual consideration was paid under this agreement.

49.     Contemporaneous with entry into the Consulting Services Agreement, Brown and Price, on behalf of RBC, and Jason Grady, on behalf of RBC International, executed an Intellectual Property License Agreement. This agreement provided for RBC to grant a non-exclusive, non-transferable license to RBC International to use RBC's patent; merchant/payment accounts; trademarks; product marketing license; domain names; distributor organization products names; licensee products; and product names. Again, there was no consideration even contemplated under this agreement.

50.     On January 24, 2020, counsel for Decentralized sent a Proposal to Accept Collateral in Partial Satisfaction of Obligation regarding the Decentralized Note (the "Decentralized Proposal"). Although Heuszel, Decentralized, Brown, and RBC entered the note knowing RBC had no intent or ability to repay it – if any value was ever transferred – Decentralized sent the correspondence indicating that RBC had defaulted in the amount of $120,000. Decentralized offered that in partial satisfaction of the outstanding balance, it would credit RBC $115,000 in exchange for accepted collateral. The accepted collateral included all of RBC USA's assets (although for months, DSS was already exercising control of RBC USA's assets pursuant to the placement of David Price as Acting CEO, the Consulting Agreement, and the Intellectual Property Licensing Agreement). On January 24, 2020, Heuszel accepted the proposal on behalf of DSS and Decentralized. On February 7, 2020, David Price accepted the proposal on behalf of RBC.

51.     DSS and Decentralized failed to conduct the Decentralized Proposal in accordance with Article 9 of the Uniform Commercial Code.

52.     On February 10, 2020, counsel for Bliss International, Inc. similarly sent its Proposal to Accept Collateral in Partial Satisfaction of Obligation regarding the Bliss Note (the "Bliss Proposal"). Bliss International, Inc. made this proposal even though it's not clear that Bliss International, Inc. ever made demand for payment under the terms of the Bliss Note. Although Heuszel, Bliss International, Inc., Brown, and RBC entered the Bliss Note knowing RBC was unable and had no intent to repay the value, Bliss International, Inc. sent the correspondence indicating that RBC had defaulted in the amount of $200,000. Bliss International, Inc. offered that in partial satisfaction of the outstanding balance, it would credit RBC $100,000 in exchange for accepted collateral. The accepted collateral included all of RBC and RBC Subsidiaries' assets (although for months, DSS was already exercising control over RBC and RBC Subsidiaries' assets

pursuant to the placement of David Price as Acting CEO, the Consulting Agreement, and the Intellectual Property Licensing Agreement).

53.     On March 2, 2020, David Price accepted the proposal on behalf of RBC and RBC USA, and Brown accepted the proposal on behalf of RBC's Subsidiaries.

54.     On March 2, 2020, Blue Elephant raised its objection to the Bliss Proposal based on its interest in the Receivables Purchase Agreement with RBC. HWH (f/k/a Bliss International, Inc.) "denies" that this objection was timely, but "in an abundance of caution … opted to conduct an Article 9 Uniform Commercial Code public foreclosure sale instead" of seizing the assets through the Bliss Proposal.

*The Sham Foreclosure Sale*

55.     On April 23, 2020, DSS conducted a "public" foreclosure sale of RBC's assets. Heuszel was the only bidder present, and his bid of $150,000 on behalf of HWH was accepted. DSS and HWH failed to conduct the foreclosure sale in accordance with Article 9 of the Uniform Commercial Code. DSS and Heuszel believed this charade would wipe out any competing security interests in RBC's assets.

56.     Upon information and belief, DSS structured the Decentralized Note and Security Agreement, the Bliss Note and Security Agreement, the Consulting Services Agreement, the Intellectual Property License Agreement, and the subsequent foreclosures to manipulate the timing of the public disclosure of its de facto acquisition of/merger with RBC.

*Maiden Becomes a Judgment Creditor*

57.     DSS entered the Consulting Services Agreement, the Intellectual Property License Agreement, the Decentralized Proposal, and the Bliss Proposal knowing that RBC had other

creditors, including Blue Elephant and Digital Media, and that Maiden was about to, and became, a judgment creditor.

58.     At the same time DSS and RBC were in the process of documenting the transfer of RBC's assets, RBC, with DSS's approval, decided to stop defending itself in Maiden's lawsuit. As referenced above, on December 19, 2019, Brown, Andrew Howard, and Heuszel agreed to allow RBC's counsel to file an Unopposed Motion for Leave to Withdraw Defendants' Answers and Counterclaim in the Maiden lawsuit.

59.     Thereafter, Maiden moved for a Default Judgment against RBC and its subsidiary MPM and Crown Medical Products, Inc. Andrew Howard informed Heuszel of the Motion for Default Judgment, and Heuszel agreed with Andrew Howard's decision to ignore the filing. Heuszel and Andrew Howard ignored Maiden's imminent judgment against RBC confident that it would not interfere with DSS and Heuszel's plans to foreclose on DSS' fraudulent secured position.

60.     On March 2, 2020, the United States District Court for the District of Texas entered a Final Default Judgment against MPM, RBC, and Crown Medical Products, Inc. in Civil Action No. 3:18-CV-1354-D. On April 20, 2020, the Court entered an Amended Judgment fixing a clerical error, the spelling of RBC in the judgment. The Amended Judgment awarded Maiden the principal amount of $4,329,000, plus prejudgment interest at the rate of 5.00% *per annum*, attorneys' fees and costs in the sum of $80,109.50, plus post-judgment interest at the maximum allowable rate.

61.     Accordingly, DSS and Heuszel assumed control of RBC's assets by October 2019, with knowledge of Maiden's pending lawsuit. DSS and Heuszel continued their efforts to legitimize DSS' acquisition of RBC in December by executing the Consulting Services Agreement

and Intellectual Property License Agreement while also permitting Andrew Howard to withdraw all of RBC's defenses to the Maiden lawsuit. DSS and Heuszel purported to acquire RBC USA's assets while Maiden's default judgment was on the horizon, and then DSS conducted the "public" foreclosure sale of RBC's assets and Heuszel, as the only bidder, "purchased" the assets once Maiden became a judgment creditor.

62.    DSS, Decentralized, HWH, RBC, RBC International, Heuszel, Brown, Andrew Howard, and Clinton Howard's actions were all part of a scheme for DSS to obtain control of RBC when it knew it was insolvent and had unpaid creditors.

## V. CAUSES OF ACTION

### COUNT I: FRAUDULENT TRANSFER

63.    Maiden incorporates the above allegations by reference.

64.    The above-described acts constitute one or more fraudulent transfers or conveyances of RBC's assets by Defendants. In an effort to shield RBC's assets from Maiden's imminent, lawful judgment collection efforts, and collection efforts from Blue Elephant, Digital Media, and other creditors, Defendants fraudulently transferred RBC, RBC USA, and RBC Subsidiaries' assets to DSS' control to avoid, hinder, and delay Maiden and other creditors. DSS obtained and continues to exercise control of these assets. Defendants DSS, Decentralized, HWH, RBC International, RBC, and Heuszel, as described supra, accepted and took some or all of the benefits derived from those transfers and assets, and as such, they are "transferees" under the Texas Uniform Fraudulent Transfer Act ("TUFTA"). At the time of the transfers, RBC was insolvent and unable to pay its obligations as they became due or became insolvent and unable to pay its obligations as a result of the transfers. Maiden's claim (as well as those of other creditors) arose before or within a reasonable time after Defendants made the fraudulent transfers.

65. The transfers were a fraud against Maiden and other creditors' rights because:

    a. the transfers were made by Defendants with the actual intent to hinder, delay, or defraud Maiden and RBC's other creditors by obtaining control of RBC's assets, including its Asian multi-level market infrastructure, without assuming RBC's liabilities to Maiden, Blue Elephant, Digital Medial, and other creditors; or

    b. the transfers were made by Defendants without RBC receiving reasonably equivalent (or any) value in exchange for the transfer of RBC's $7,500,000-$12,000,000 worth of assets, and resulting proceeds or right to proceeds, and as the above allegations show, RBC intended to incur, or believed, or reasonably should have believed that the transfers would cause RBC to incur debts beyond its ability to pay as they became due.

66. Defendants' actual intent to hinder, delay, or defraud Maiden and other creditors is evident in that the allegations support that the following badges of fraud are present here:

- The transfers were to insiders, including DSS, Decentralized, HWH, RBC International, and Heuszel;

- The transfers, including DSS' initial assumption of control of RBC's operations, were concealed;

- Before the transfers were made, Maiden had filed suit against RBC;

- The transfers comprised of all of RBC and its subsidiaries' assets, leaving it a shell company without inventory, intellectual property, or revenue, and a mountain of debt;

- RBC did not receive reasonably equivalent (or any) value for the transfers;

- RBC was insolvent or became insolvent shortly after the transfers were made or entry in the Decentralized Note and Security Agreement and the Bliss Note and Security Agreement;

- RBC transferred its essential assets to Decentralized, HWH, and RBC International who transferred the assets to DSS and Heuszel, insiders of RBC.

67. Accordingly, Defendants have violated Texas Business and Commerce Code Sections 24.005. Defendants transferred all of RBC's assets to Decentralized, HWH, and RBC International that are, in reality, owned or controlled by DSS, all in fraud upon Maiden and other creditors. DSS, Decentralized, HWH, RBC International, and Heuszel are at least transferees of

those fraudulent transfers and took neither in good faith (because Decentralized, HWH, and RBC International are controlled by insiders DSS and Heuszel, who caused the fraudulent transfers) or for reasonably equivalent value (as the $7,500,000 to $12,000,000 worth of assets were just given away or taken for no payment in return).

68.     Alternatively, Defendants have violated Texas Business and Commerce Code Section 24.006. Maiden's claim arose prior to Defendants' transfer of all of RBC's assets to Decentralized, HWH, and RBC International that are, in reality, owned or controlled by DSS. RBC did not receive reasonably equivalent value in exchange for the transfer (as the $7,500,000 to $12,000,000 worth of assets were just given away or taken for no payment in return). And RBC was either insolvent at the time of the transfer or became insolvent as a result of the transfer of all of its assets to Defendants Decentralized, HWH, RBC International, and effectively, DSS and Heuszel.

69.     Maiden sues for:

- a judgment against Defendants, jointly and severally, in the amount of Maiden's underlying judgment and the other creditors' claims against RBC or for the value of assets transferred to DSS, Decentralized, HWH, RBC International, and Heuszel, or others in violation of TUFTA, whichever is less (plus costs, interest, and attorneys' fees); or, in the alternative,

- avoidance of transfers to the extent necessary to satisfy Maiden's claims;

- attachment or other provisional remedy against the assets fraudulently transferred or other property of Defendants DSS, Decentralized, HWH, RBC International, RBC, and Heuszel;

- an injunction against further disposition of the assets fraudulently transferred or of other property, by Defendants DSS, Decentralized, HWH, RBC International, RBC, and Heuszel;

- appointment of Receiver Michael L. Jones to take charge of the assets fraudulently transferred to Defendants (and previously turned over to him in in Civil Action No. 3:18-CV-1354-D) and/or other property of Defendants; and

- avoidance of the transfers; and

- any other relief the circumstances require, including but not limited to any remedy under Texas Business and Commerce Code §§ 24.008 and 24.009;

## COUNT II: UNJUST ENRICHMENT
### (against Defendants DSS, Decentralized, HWH, RBC International, and Heuszel)

70.    Maiden incorporates the above allegations by reference.

71.    Defendants DSS, Decentralized, HWH, RBC International, and Heuszel were unjustly enriched at Maiden's and RBC's other creditors' expense.

72.    Through Defendants' fraudulent scheme to transfer RBC's assets to DSS, Decentralized, HWH, RBC International, and Heuszel, without assumption of any of RBC's liabilities, and leaving RBC a shell corporation, as detailed above, Defendants caused the actual transfer of all of RBC's assets for nothing paid to RBC in return. Defendants DSS, Decentralized, HWH, RBC International, and Heuszel benefited directly from the transfer of RBC's assets, including its desired multi-level market in Asia, as described above.

73.    Defendants DSS, Decentralized, HWH, RBC International, and Heuszel's retention of the above-mentioned benefits would violate fundamental principles of justice, equity, and good conscious.

74.    As a result of Defendants DSS, Decentralized, HWH, RBC International, and Heuszel's unjust enrichment, equity and good conscious require appropriate restitution to Maiden.

## COUNT III: DECLARATORY JUDGMENT
### (against Defendants DSS and HWH)

75.    Maiden incorporates the above allegations by reference.

76.    Defendants DSS and HWH's purported public foreclosure sale of RBC and RBC Subsidiaries' assets violated the UCC because (1) Defendants DSS and HWH lacked a valid

security interest in RBC and RBC Subsidiaries' assets because Defendants failed to give consideration to secure any interest in the assets; (2) Defendants used their own insider, DSS' consultant and RBC's "acting CEO" David Price to approve the Bliss Proposal and the subsequent foreclosure sale on RBC's behalf; and (3) the foreclosure sale was not conducted with proper notice, in a commercially reasonable manner, or in good faith.

77.     Maiden seeks a declaration that: (1) Defendants lacked a valid security interest in RBC and RBC Subsidiaries' assets and therefore lacked the authority to sell the assets during the public foreclosure sale; (2) Defendant Heuszel's low bid on behalf of HWH at the public foreclosure sale was invalid and void; (3) the public foreclosure sale was conducted in a commercially unreasonable manner; and (4) Defendants do not have the legal authority to transfer RBC and RBC's Subsidiaries assets to HWH.

### COUNT IV: VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
**(against Defendants DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard)**

78.     Maiden incorporates the above allegations by reference.

*The RICO "Person" and "Enterprise"*

79.     Each of DSS, RBC International, Decentralized, and HWH is a "person" as that term is defined in 18 U.S.C. § 1961(3).

80.     Each of Heuszel, Brown, Andrew Howard, and Clinton Howard is a "person" as that term is defined in 18 U.S.C. § 1961(3).

81.     Collectively, DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard form an "enterprise" as defined by 18 U.S.C. § 1961(4). DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard have been associated in fact and have functioned in an organized fashion, having a joint

purpose of acting together for each other's benefit in assuming control of RBC, misappropriating RBC's assets to establish RBC International and support DSS, HWH, and Decentralized, for the purposes of enriching themselves at the expense of RBC's creditors, including Maiden, pursuant to the fraudulent scheme alleged above, and DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard have therefore had business and, upon information and belief, personal relationships with each other over an extended period of time. Each member conducted the affairs of the Enterprise through a pattern of racketeering activity – namely, mail fraud, wire fraud, and bank fraud perpetrated through email and other electronic transmissions and wire transfers.

82.     Further, DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard, acted as an Enterprise, orchestrating their joint misconduct over an approximate one and a half year period, and upon information and belief, continue their joint misconduct today.

83.     DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard used RBC as an instrumentality to accomplish their misconduct, as DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard controlled RBC, at relevant times.

84.     At all times material to the allegations stated herein, the Enterprise was engaged in, or had some effect upon, interstate commerce as RBC, and subsequently RBC's assets invested in RBC International, Decentralized, HWH, and DSS, have done business in various states, including, but not limited to, Texas, New York, Nevada, and multiple Asian countries.

85.     As alleged herein, the Enterprise's purpose was to serve as the vehicle through which DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and

Clinton Howard implemented their continuous and ongoing scheme to assume control of RBC, misappropriate RBC's assets to establish RBC International and support DSS' other subsidiaries, for the purposes of enriching themselves at the expense of Maiden and RBC's other creditors. The intended purpose of the Enterprise's scheme was to misappropriate RBC's assets, valued between $7,500,000 and $12,000,000, from RBC's creditors, and continue RBC's business and operations through RBC International, Decentralized, HWH, and DSS, while allowing DSS to manipulate its SEC disclosure obligations.

*The Pattern of Racketeering Activity*

86.    Brown, Andrew Howard, and Clinton Howard initially controlled RBC and in concert with DSS, RBC International, Decentralized, HWH, and Heuszel, effectuated the misappropriation of RBC's assets for benefit of RBC International, HWH, Decentralized, Hueszel, and DSS, as part of the scheme with DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard to defraud and injure RBC's creditors and allow DSS to manipulate its SEC disclosure obligations.

87.    DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard were the primary decision makers in the fraudulent scheme and made all major decisions concerning the assumption of control of RBC's assets and the subsequent fraudulent transfers and agreements that purport to grant DSS, Decentralized, HWH, and RBC International ownership and unfettered use of RBC's assets. Once in full control of RBC, through a course of conduct, DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard executed and/or entered multiple legal documents that purported to allow RBC International unfettered use of RBC's assets and to grant Decentralized and HWH a security interest in those same assets. DSS, RBC International, Decentralized, HWH, Heuszel,

Brown, Andrew Howard, and Clinton Howard also engaged in multiple wire transfers between various bank accounts all under DSS's control from September 2019 through September 2020 in furtherance of the scheme to give legitimacy to the paper transactions. Moreover, DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard acted to accomplish the scheme that defrauded and injured Maiden and RBC's other creditors and allowed the manipulation of DSS' public SEC disclosures.

88.     DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard, by and through the Enterprise, committed at least two related acts of racketeering activity, or Predicate Acts), which occurred within ten years of each other within the meaning of 18 U.S.C. § 1961(5), as alleged in more detail below.

*Predicate Acts*

89.     Between September 25, 2019 and the present, DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard executed their unlawful racketeering activity targeted at fraudulently assuming control of RBC's assets, misappropriating those assets to establish RBC International and benefit HWH, Decentralized, and DSS, defrauding RBC's creditors, and allowing the manipulation of DSS' SEC disclosure obligations, through the following mailings and interstate wires (*e.g.,* electronic mail, electronic submissions, and wire transfers). Each such communication is a discrete violation of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), or 1344 (bank fraud) and a "predicate act" of racketeering activity pursuant to 18 U.S.C. § 1961(1) (the "Predicate Acts"):

- At least thirty-four wire transfers from September 15, 2014 through September 15, 2020, including transfers from DSS' Nevada bank account to RBC USA's Texas bank account, from RBC USA's Texas bank account to DSS' Nevada bank account, from RBC USA's Texas bank account to RBC International's Nevada bank account, and from RBC USA's Texas bank account to HWH's bank account, for a total of at least $811,667.18 in funds between bank accounts controlled by

DSS for the purpose of continuing the façade that there were legitimate arms' length loan transactions occurring.

- Transmitting the Decentralized Note and Decentralized Security Agreement in or around October 9, 2019, in support of the fraudulent transfers, via email and/or U.S. mail.

- Transmitting the Bliss Note and Bliss Security Agreement in or around November 11, 2019, in support of the fraudulent transfers, via email and/or U.S. mail.

- Transmitting the UCC-1 statements for the Decentralized Note and Decentralized Security Agreement on October 14, 2019 and October 18, 2019, to the Office of the Secretary of the State of Nevada, in support of the fraudulent transfers.

- Transmitting the UCC-1 statements for the Bliss Note and Bliss Security Agreement on November 21, 2019, to the Office of the Secretary of the State of Nevada, in support of the fraudulent transfers.

- Transmitting the Consulting Services Agreement, allowing RBC International unfettered access to RBC's assets and acquisition of RBC USA's stock for no consideration in return, on or around December 3, 2019, via email and/or U.S. mail.

- Transmitting the Intellectual Property License Agreement, allowing RBC International an all access license to RBC's intellectual property for no consideration in return, on or around December 3, 2019, via email and/or U.S. mail.

- Transmitting the Proposal to Accept Collateral in Partial Satisfaction of Obligation, allowing Decentralized to fraudulently acquire RBC USA's assets, via U.S. Mail on January 24, 2020, and the subsequent executed agreement to the proposal via email and/or U.S. mail on February 7, 2020.

- Transmitting the Proposal to Accept Collateral in Partial Satisfaction of Obligation, allowing Bliss to fraudulently acquire RBC and RBC's Subsidiaries' assets, via U.S. Mail on February 10, 2020, and the subsequent executed agreement to the proposal via email and/or U.S. mail on February 7, 2020.

- Emails between Brown, Andrew Howard, and Heuszel on December 19, 2019 and December 23, 2019, acquiescing RBC's withdrawal of counsel in the Maiden lawsuit.

- Transmitting DSS' Form 10-K to the SEC on or around December 31, 2019, asserting misrepresentations regarding the fraudulent transfers made pursuant to the Decentralized Note and the Bliss Note, the fraudulent transfers made pursuant

to the foreclosure proceedings, and the timing when DSS assumed control of RBC's assets.

- Transmitting DSS' periodic reporting to the SEC, in the form of its annual Form 10-K (for the fiscal year ending December 31, 2020), its quarterly Form 10-Qs, and/or its current Form 8-K, after assuming control of RBC and acquiring all of its assets in October 2019, with manipulated information.

- Emails between Heuszel, Andrew Howard, Grady, and Price on February 28, 2020 and March 2, 2020, agreeing to ignore Maiden's default judgment based on false representations of DSS' secured interest.

- Transmitting the Decentralized Security Agreement and Bliss Security Agreement on May 15, 2020, via U.S. Mail, asserting false representations of DSS' alleged secured interest in RBC's assets and attempting to interfere with Maiden's post judgment collection efforts.

- Emails from counsel for Decentralized to Prosperity Bank on or around June 2, 2020 and June 3, 2020 asserting false representations of Decentralized's alleged secured interest in RBC's assets and requesting Prosperity Bank reject Maiden's garnishment action based on those false representations.

- Transmitting Decentralized and HWH's Motion for Intervention in Maiden's underlying lawsuit on November 2, 2020, asserting false representations of Decentralized and HWH's alleged secured interest in RBC's assets and attempting to interfere with Maiden's post judgment collection efforts.

- Transmitting Decentralized and HWH's Opposing to Maiden's Third Application for Turnover Order of RBC's assets in Maiden's underlying lawsuit on January 12, 2021, asserting false representations of Decentralized and HWH's alleged secured interest in RBC's assets and attempting to interfere with Maiden's post judgment collection efforts.

90.     DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard distributed agreements, supposed loan agreements, supposed security agreements, email communications, letters, public reports required by the SEC, and other documents containing material misrepresentations and/or omissions related to their alleged secured interest in and acquisition of all of RBC's assets and its subsidiaries' assets by mail and/or wire in interstate commerce.

91.     In reality, DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard attempted to legitimize their fraudulent scheme through such communications and transfers.

92.     Each of the Predicate Acts include statements that were knowingly false and/or made with reckless indifference as to their truth or falsity, and was made with intent to fraudulently acquire all of RBC and its subsidiaries' assets while avoiding RBC's creditors and manipulating DSS' SEC disclosure obligations.

93.     These Predicate Acts consisted of communications and transmissions through the mail, online, and across the interstate wires. They were intended to, and did in fact, directly or indirectly affect the Enterprise, by allowing the Enterprise to assume control of RBC and obtain funds and other assets for the organization of RBC International and benefit of DSS, HWH, and Decentralized, which were misappropriated. The Predicate Acts also served to protect the positions of DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard, so that DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard could continue to control and profit from RBC's assets, avoid RBC's creditors, and DSS could manipulate its SEC disclosure obligations.

94.     DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard's repeated violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), or 1344 (bank fraud) have occurred for more than one year, commencing in September 2019, 2014, and were continuous throughout the relevant time period through today.

95.     The Predicate Acts are related and connected to the same unlawful scheme or artifice, to acquire all of RBC's assets and expand DSS' reach in the Asian market, through RBC International, Decentralized, and HWH, for no payment in return to RBC, and ultimately, to

defraud RBC's creditors and manipulate DSS' SEC disclosure obligations, which was devised and executed by DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard.

*Injury to Maiden and RBC's other creditors*

96.    As a direct and proximate result of DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard's racketeering activities, Maiden suffered actual damages in the amount of its underlying judgment, over $5,000,000. Maiden has been directly, purposefully, and foreseeably injured in its business by reason of DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard's violations of 18 U.S.C. § 1962(a), (b). Maiden is a "person" who has suffered a compensable injury as a result of DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard's unlawful activities, as defined in 18 U.S.C. § 1962(a), (b).

97.    Pursuant to 18 U.S.C. § 1964(c), Maiden is entitled to recover three times the actual damages that it has sustained as a direct and proximate cause of the Enterprise's unlawful racketeering activity, amounting to at least $15,000,000, as well as Maiden's reasonable attorney's fees and litigation expenses.

98.    The intended, direct and foreseeable consequence of DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard's unlawful racketeering activity, as described above, was and is to assume control of RBC, fraudulently transfer RBC's $7,500,000 to $12,000,000 worth of assets to DSS' control to establish RBC International and benefit DSS, Decentralized, and HWH, thereby defrauding RBC's creditors, including Maiden.

99.     The unlawful racketeering activity allowed DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard to misappropriate all of RBC's assets for DSS' profit and away from RBC's creditors' control. The unlawful racketeering activity also served to protect the positions of DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard so that DSS, RBC International, Decentralized, HWH, and Heuszel could utilize RBC's assets, including its Asian marketing infrastructure, and Brown, Andrew Howard, and Clinton Howard could continue to operate the shell of RBC, thereby ensuring the continuation of the fraudulent scheme allowing them to misappropriate RBC's assets without answering to RBC's creditors.

100.    As a result of DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard's racketeering activity and scheme to defraud, Maiden has suffered damages in excess of the minimum jurisdictional limit of this Court, for which it seeks recovery. Maiden has suffered injury to its business as a result of DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard's fraudulent acquisition of RBC's assets away from Maiden's entitled access through a pattern of racketeering activity.

101.    The misappropriation of assets and self-dealing perpetrated by DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard has precluded Maiden the ability to satisfy its outstanding judgment against RBC and stifled its post judgment collection efforts. Maiden was also injured by DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard's fraudulent and racketeering activity because it misappropriated RBC's assets and prevented the business from continuing to operate and pay Maiden and its other creditors.

102.    Maiden is entitled to treble damages and attorneys' fees based upon DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard's violations of 18 U.S.C. § 1962(a), (b).

103.    Maiden did not discover its injuries resulting from DSS, RBC International, Decentralized, HWH, Heuszel, Brown, Andrew Howard, and Clinton Howard's pattern of racketeering activity until in or around September 2020.

## COUNT V: EXEMPLARY DAMAGES

104.    Maiden incorporates the above allegations by reference.

105.    In the alternative to Maiden' RICO claim, Defendants committed or caused to be committed the wrongful acts and fraudulent transfers alleged herein with malice towards Maiden and other creditors, in that they took those actions (or caused them to be taken) with ill will, spite, evil motive, or a purpose to injure Maiden and other creditors by defrauding their rights to recover against RBC.

106.    Alternatively, Defendants committed (or caused to be committed) the wrongful acts and fraudulent transfers herein with conscious-indifference malice towards Maiden and other creditors, in that their acts or omissions as alleged involved an extreme degree of risk to the rights of Maiden and other creditors, when viewed objectively, and Defendants had actual, subjective awareness of the risks to the rights of Maiden's and other creditors but proceeded with a conscious indifference to them.

107.    Alternatively, Defendants committed actual fraud through the wrongful acts and fraudulent transfers herein.

108.    Under these circumstances, the law authorizes the imposition of punitive or exemplary damages over and above the other damages sought herein, for which Maiden seeks recovery in an amount at least equal to an additional amount that is the equivalent of Maiden's

underlying judgment against Defendant RBC plus the other creditors' claims against Defendant RBC.

### COUNT VI: ATTORNEYS' FEES

109.    Maiden is entitled to recover reasonable and necessary attorney's fees and costs for the claim against Defendants.

110.    Specifically, in addition to RICO, as alleged herein, under Texas's fraudulent transfer law, Plaintiff may be awarded attorneys' fees and costs as are equitable and just (see TEX. BUS. & COMM. CODE § 24.013).

### VI.
### PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Maiden Biosciences, Inc. prays that upon final trial or other disposition, the Court enter a judgment, as follows:

a.    for treble damages based on Defendants' violations of 18 U.S.C. § 1962(a), (b), or alternatively, for damages against Defendants, jointly and severally, in the amount of Maiden's underlying judgment against RBC plus the other creditors' claims or for the value of the assets fraudulently transferred in violation of TUFTA, whichever is less, plus, punitive or exemplary damages against Defendants, jointly and severally, as stated above and awarded by the trier of fact;

b.    pre-judgment interest against all Defendants, jointly and severally, accruing through the date of trial;

c.    post-judgment interest against all Defendants, jointly and severally, at the highest rate allowed by law;

d.    reasonable attorneys' fees against all Defendants, jointly and severally, and through trial and for all levels of appeal;

e.    all court costs against all Defendants, jointly and severally;

f.    declaratory judgment stating that (1) Defendants lacked a valid security interest in RBC and RBC Subsidiaries' assets and therefore lacked the authority to sale the assets during the public foreclosure sale; (2) Defendant Heuszel's low bid at the public foreclosure sale was invalid and void; (3) the public foreclosure sale was conducted in a commercially unreasonable manner; and (4) Defendants do not have

the legal authority to transfer RBC and RBC's Subsidiaries assets to Heuszel and HWH; and

g.       for all such other and further relief at law or in equity to which Maiden may show itself justly entitled.

Dated:  February 15, 2021

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By:      */s/ Jeffrey S. Lowenstein*
         Jeffrey S. Lowenstein
         State Bar No. 24007574
         jlowenstein@bellnunnally.com
         Randall K. Lindley
         State Bar No. 12367300
         rlindley@bellnunnally.com
         Sydnie A. Shimkus
         State Bar No. 24093783
         sshimkus@bellnunnally.com

2323 Ross Avenue, Suite 1900
Dallas, Texas  75201
(214) 740-1400
(214) 740-1499 Telecopy

**ATTORNEYS FOR PLAINTIFF
MAIDEN BIOSCIENCES, INC.**