# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| MAIDEN BIOSCIENCES, INC. | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-0327-D |
| | § | |
| DOCUMENT SECURITY SYSTEMS, | § | |
| INC., DECENTRALIZED SHARING | § | |
| SYSTEMS, INC., HWH WORLD, INC. | § | |
| F/K/A/ BLISS INTERNATIONAL, INC., | § | |
| RBC LIFE SCIENCES, INC., RBC LIFE | § | |
| INTERNATIONAL, INC., FRANK D. | § | |
| HEUSZEL, STEVEN E. BROWN, | § | |
| CLINTON HOWARD, and ANDREW | § | |
| HOWARD | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S RESPONSE AND SUPPORTING BRIEF IN OPPOSITION TO DEFENDANTS DOCUMENT SECURITY SYSTEMS, INC., DECENTRALIZED SHARING SYSTEMS, INC., HWH WORLD, INC. F/K/A BLISS INTERNATIONAL, INC., RBC LIFE INTERNATIONAL, INC., AND FRANK HEUSZEL'S MOTION TO DISMISS AND BRIEF IN SUPPORT

By: */s/ Sydnie A. Shimkus*
Jeffrey S. Lowenstein
State Bar No. 24007574
jlowenstein@bellnunnally.com
Randall K. Lindley
State Bar No. 12367300
rlindley@bellnunnally.com
Sydnie A. Shimkus
State Bar No. 24093783
sshimkus@bellnunnally.com
**BELL NUNNALLY & MARTIN, LLP**
2323 Ross Avenue, Suite 1900
Dallas, Texas  75201
Telephone:      (214) 740-1400
Fax:              (214) 740-5725

**ATTORNEYS FOR PLAINTIFF
MAIDEN BIOSCIENCES, INC.**

# TABLE OF CONTENTS

**PAGE**

I.    PRELIMINARY STATEMENT ............................................................... 1

II.    RELEVANT FACTUAL BACKGROUND..................................................... 2

     A.    The Initiation of the Enterprise. ........................................................... 2

     B.    Defendants' Racketeering Activities. ................................................... 6

          1.    RBC moved all of its assets to DSS in violation of TUFTA. ....................7

          2.    Decentralized and HWH acquire RBC's assets through fraudulent promissory notes and subsequent compromise agreements and a foreclosure sale. ......................................................................7

          3.    RBC International acquires RBC's assets through sham agreements. ..............................................................................8

          4.    DSS' Defendants oppose RBC's secured creditors' interests.....................9

          5.    DSS' Fraudulent Representations to Harm Other Third Parties. ...............10

III.    ARGUMENTS AND AUTHORITIES.......................................................... 10

     A.    Applicable Legal Standard for Federal Rule of Civil Procedure 9(b) and 12(b)(6) Motion to Dismiss................................................................. 10

     B.    Maiden Has Stated a RICO Claim Against DSS Defendants. ............................ 12

          1.    Summary of Maiden's RICO allegations against DSS Defendants...........12

          2.    Maiden has properly alleged a "Pattern of Racketeering Activity."..........14

          3.    Maiden has properly alleged the existence of an "Enterprise" .................23

     C.    Maiden Has Stated a Claim Against DSS and RBC International under TUFTA.26

     D.    Maiden Has Stated a Claim for Unjust Enrichment............................................ 28

     E.    Maiden Has Sufficiently Plead Support for an Award of Exemplary Damages... 29

IV.    CONCLUSION.................................................................................... 29

# TABLE OF AUTHORITIES

**CASES**

*ABN-AMRO Mortgage Group, Inc. v. Mikel*, A-04-617-LY, 2005 WL 8155229 (W.D. Tex. Dec.

12, 2005), report and recommendation adopted, A-04-617-LY, 2006 WL 8432137 (W.D. Tex.

June 8, 2006) ......................................................................................................... 22

*Abraham v. Singh*, 480 F.3d 351 (5th Cir. 2007) .......................................................... 22

*Allstate Ins. Co. v. Benhamou,* 190 F. Supp. 3d 631 (S.D. Tex. 2016 .......................... 22

*Allstate Ins. Co. v. Plambeck*, 802 F.3d 665 (5th Cir. 2015) ........................................ 15

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ........................................................ 11

*Cadle Co. v. Schultz*, 779 F. Supp. 392 (N.D. Tex. 1991) ...................................... 14, 15

*Carpenter v. United States*, 484 U.S. 19 (1987) ........................................................... 14

*Clapper v. Am. Realty Inv'rs, Inc*., 3:14-CV-2970-D, 2016 WL 302313 (N.D. Tex. Jan. 25, 2016)

............................................................................................................................. 28, 29

*Commercial Metals Co. v. Chazanow*, CIV.A. 309-CV-0808-B, 2009 WL 3853704 (N.D. Tex.

Nov. 17, 2009) ....................................................................................................... 23

*Cypress/Spanish Ft. I, L.P.*, 814 F. Supp. 2d 698 (N.D. Tex. 2011) ...................... 19, 21

*Dale v. Frankel,* 131 F. Supp. 2d 852 (S.D. Miss. 2001) ............................................. 13

*Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241 (5th Cir. 1988) ................ 12

*Esse v. Empire Energy III, Ltd.*, 333 S.W.3d 166 (Tex. App.—Houston [1st Dist.] 2010, pet.

denied) .................................................................................................................... 26

*Fugett v. DCP Midstream, L.P.,* 2:14-CV-00111-J, 2015 WL 510965 (N.D. Tex. Feb. 6, 2015) 11

*H.J., Inc. v. Nw. Bell Telegraph Co.*, 492 U.S. 229 (1989) .............................. 20, 21, 23

*Hart v. Bayer Corp.*, 199 F.3d 239 (5th Cir. 2000) ....................................................................... 11

*Herrmann Holdings, Ltd. v. Lucent Techs., Inc.*, 302 F.3d 552 (5th Cir. 2002).......................... 12

*Janvey v. Libyan Inv. Auth.*, 840 F.3d 248 (5th Cir. 2016)............................................................ 26

*Leleux v. United States*, 178 F.3d 750 (5th Cir. 1999)................................................................... 11

*Matter of Life Partners Holdings, Inc.*, 926 F.3d 103 (5th Cir. 2019) ......................................... 26

*Metals Co. v. Chazanow*, No. 3:09-cv-808-B, 2009 WL 3853704 (N.D. Tex. Nov. 17, 2009)... 15

*Orthoflex, Inc. v. ThermoTek, Inc.*, 3:11–CV–0870–D, 2012 WL 2864510 (N.D. Tex. July 12,
2012) ................................................................................................................................... 12

*Reuther v. Smith,* Civ.A. 01-3625, 2002 WL 1303119 (E.D. La. June 12, 2002) ........................ 13

*Snow Ingredients, Inc. v. SnoWizard, Inc.,* 833 F.3d 512 (5th Cir. 2016) ................................... 20

*Thompson v. City of Waco, Texas,* 764 F.3d 500 (5th Cir. 2014)................................................... 11

*Tuchman v. DSC Communications Corp.,* 14 F.3d 1061 (5th Cir.1994)........................................ 11

*Tujague v. Eckerd,* 4:18-CV-00408, 2018 WL 3376967 (E.D. Tex. July 11, 2018).................... 13

*United Healthcare Services, Inc. v. Next Health, LLC*, 3:17-CV-00243-E-BT, 2021 WL 764035
(N.D. Tex. Feb. 26, 2021) ............................................................................................ 14, 15

*United States v. Elliott,* 571 F.2d 880 (5th Cir.1978) ................................................................... 23

*Willbros Int'l, Inc. v. Tillery*, CV H-08-3725, 2009 WL 10700118 (S.D. Tex. June 17, 2009)... 13

*Womack v. Nissan N. Am., Inc.*, 550 F. Supp. 2d 630 (E.D. Tex. 2007) ...................................... 11

*Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118 (5th Cir. 1996).......... 22

## STATUTES

18 U.S.C. § 1341.................................................................................................................... 14, 18

18 U.S.C. § 1343.................................................................................................................... 14, 18

18 U.S.C. § 1344........................................................................................................................... 18

18 U.S.C. § 1961 ................................................................................................ 14, 21, 23

18 U.S.C. § 1962 ........................................................................................................ 12

18 U.S.C. § 1964 ........................................................................................................ 12

FED. R. CIV. P. 8(a)(2) ............................................................................................... 11

FED. R. CIV. P. 9(b) .................................................................................................... 11

TEX. BUS. & COMM. CODE § 24.009 ........................................................................... 26

## OTHER AUTHORITIES

Pub. L. No. 91–452, 84 Stat. 922 (1970) .................................................................... 12

Plaintiff Maiden Biosciences, Inc. ("Maiden" or "Plaintiff") files this Response and Supporting Brief in Opposition to Defendants Document Security Systems, Inc. ("DSS"), Decentralized Sharing Systems, Inc. ("Decentralized"), HWH World, Inc. f/k/a Bliss International, Inc. ("HWH"), RBC Life International, Inc. ("RBC International"), and Frank Heuszel ("Heuszel") (together, the "DSS Defendants") Motion to Dismiss and Brief in Support (the "Motion"), and in support thereof respectfully shows the Court as follows:

## I.
## PRELIMINARY STATEMENT

DSS Defendants' Motion should be denied because the claims set forth in Maiden's Original Complaint (the "Complaint"), filed on February 15, 2021, are supported by allegations containing far greater specificity than necessary to satisfy the pleading requirements under the federal rules, including the heightened pleading requirements under Rule 9(b).

This case arises as a result of the DSS Defendants' wrongful conduct in entering into an unlawful scheme with RBC Life Sciences, Inc. ("RBC"), Steven Brown ("Brown"), and Andrew Howard ("Howard") to fraudulently transfer RBC's assets (valued at more than $7,500,000), in exchange for nothing, while simultaneously manipulating DSS' mandatory public disclosures and cheating RBC's creditors. DSS Defendants continue to utilize and profit from these assets today.

The Complaint details a carefully orchestrated scheme involving numerous players to take over an insolvent company's desirable assets for nothing in return while simultaneously disadvantaging known creditors and manipulating public disclosure requirements. And the Complaint adequately pleads claims against the DSS Defendants for: (1) violation of the Racketeer Influenced Corrupt Organizations Act ("RICO"); (2) violation of the Texas Uniform

Fraudulent Transfer Act ("TUFTA"); and (3) unjust enrichment; and to recover exemplary damages. Because Plaintiff has plead sufficient facts describing the wrongful conduct of the DSS Defendants in support of its claims, the Motion should be denied in its entirety.

## II.
## RELEVANT FACTUAL BACKGROUND

### A.       The Initiation of the Enterprise.

Beginning in or around October 2017, RBC Life Sciences, Inc. ("RBC") was in a dire financial situation and avoiding substantial payments due to its vendors, suppliers, and lenders, including Maiden. *See* [Dkt. 1], ¶¶ 19-20. By mid-2019, RBC's financial situation had escalated as it was facing millions of dollars' worth of liabilities and a growing number of secured creditors. *Id.* at ¶ 21-22. At the same time, DSS, at the directive of its Chairman and influential investor Heng Fai Chan, was looking to expand the company's reach in Asia. *Id.* at ¶¶ 23-24. Advantageously, the parties were connected. *Id.* at ¶ 23. However, what began as negotiations of DSS' potential merger with or acquisition of RBC led to a scheme devised initially by Heuszel, on behalf of DSS, and Brown and Howard, on behalf of RBC, for DSS to acquire RBC's desirable assets, including a sophisticated multilevel marketing infrastructure in the Asian market and intellectual property portfolio. *Id.* at ¶ 32. In return, the scheme left nothing for RBC's secured creditors and soon to be judgment creditors, like Maiden.

Each player had a key role in the Enterprise. Heuszel as the CEO of DSS and a licensed attorney, appears to have been the mastermind of the enterprise. *Id.* at ¶¶ 24, 35, 37-39, 44-46, 50, 52, 55, 58-59, 61-62, 89.  For reasons that will need to be determined after additional discovery, Heuszel structured the scheme to avoid an actual merger with RBC. *Id.* at ¶ 45. One clear motivation was avoiding RBC's creditors that were too stubborn to acquiesce to Heuszel's

negotiations. *Id.* at ¶¶ 31-32, 44-45. Heuszel also seems to have been at the helm of structuring the scheme through a series of fraudulent agreements to attempt to legitimize DSS' fraudulent takeover. *Id.* at ¶¶ 37-39, 45, 47-49, 50-56.

Brown orchestrated the scheme from the RBC side of the equation. *Id.* at ¶¶ 24, 29, 33-42, 44, 47-49, 50, 52-53, 58-59, 62. Brown acquiesced to David Price ("Price") (a consultant for DSS) stepping in as the acting CEO of RBC in October 2019. *Id.* at ¶ 29. Brown acquiesced in moving all of the assets of RBC to DSS. *Id.* at ¶¶ 33-42, 47-49, 50, 52-53, 58-59. And Brown willingly executed a series of Heuszel created documents that he knew were fraudulent and made solely to paper the transfer of control to DSS. *Id.* at ¶¶ 33-42, 47-49, 50, 52-53.

Howard, Director of RBC and also a licensed attorney, assisted Brown in devising the scheme on behalf of RBC to escape RBC's growing list of liabilities. *Id.* at ¶¶ 22-25, 37, 44, 58-59, 62. Howard initiated negotiations with DSS to acquire or merge with RBC, informed DSS of RBC's known creditors, and once DSS was unable to resolve RBC's outstanding liabilities with such creditors, Howard acquiesced in DSS' takeover of RBC for no payment in return. *Id.* at ¶¶ 22-25, 37, 62. Further, Howard acquiesced to DSS and Heuszel's directive to let Maiden obtain a default judgment against RBC, and thus become an additional creditor. *Id.* at ¶¶ 44, 58-59, 62.

Price, while not a named Defendant, was also an active participant in the Enterprise. Price was brought in to assist DSS with entering the Asian multilevel market but ended up playing a number of roles in the scheme. *Id.* at ¶¶ 25, 29, 46-50, 52-53. Once DSS assumed control of RBC, Price was inserted as RBC's acting CEO while simultaneously serving as a "lending representative" for DSS's "loans" to RBC, even though he had no experience in lending. *Id.* at ¶ 46. Thereafter, when DSS formed RBC International to formally acquire RBC's fraudulently obtained assets, Price became President of the DSS subsidiary. *Id.* at ¶ 29.

RBC, at the hands of Brown and Howard, was a key pawn in the Defendants' overall scheme. RBC was in a dire financial situation and facing many creditors, like Blue Elephant Financing LLC ("Blue Elephant") and Digital Media Group – US LLC ("Digital Media Group"), and soon to be creditors, including Maiden. *Id.* at ¶¶ 20-21. RBC was looking for a solution to avoid these liabilities and ultimately allowed DSS, Heuszel, HWH, Decentralized, and RBC International to assume control of its assets, without payment, and to cut out its creditors. *Id.* at ¶¶ 22, 25, 30, 36, 42, 44-53, 62. RBC executed multiple documents knowing they permitted the fraudulent transfer of its assets worth millions of dollars for no payment in return. *Id.* at ¶¶ 31-42, 47-50, 52-53. Also, beginning in 2017, RBC avoided payment to Maiden, and by 2019, knowingly withdrew its defenses to Maiden's lawsuit, which permitted Maiden to obtain a multi-million dollar judgment against it. *Id.* at ¶¶ 19-20, 44, 57-60. RBC permitted entry of this judgment while simultaneously allowing DSS to assume control over its remaining assets. *Id.*

Decentralized, a subsidiary of DSS, was an active participant in the overall scheme to acquire RBC's assets, for free, and to cut out RBC's creditors. After DSS obtained control of RBC's assets, Decentralized entered a promissory note that purported to loan RBC $200,000, which neither Decentralized nor DSS ever paid to RBC. *Id.* at ¶¶ 31-37. Instead, the loan allowed Decentralized to formally acquire RBC's assets for free following its misrepresentation that RBC had defaulted on the purported note. *Id.* at ¶¶ 50-51.

HWH was specifically created to assist the overall scheme of the Enterprise. DSS created HWH (formerly Bliss) in October 2019 to utilize RBC's assets that were fraudulently acquired pursuant to the scheme. *Id.* at ¶ 26. After DSS obtained control of RBC's assets, HWH purported to loan RBC up to $800,000 in the form of a revolving line of credit to RBC, which neither HWH nor DSS ever paid to RBC. *Id.* at ¶¶ 38-42. Similarly, the note allowed HWH to formally

acquire all of RBC's assets for free following the misrepresentation to RBC that it had defaulted on the note. *Id.* at ¶¶ 52-53. HWH then doubled down on its fraudulent assertion of ownership interest in RBC's assets pursuant to the note by conducting a sham foreclosure sale to paper its control and cut out RBC's known creditors, specifically Blue Elephant. *Id.* at ¶¶ 55-56.

Likewise, RBC International was specifically created in November 2019 to continue the ongoing business of RBC as an integral part of the overall scheme. *Id.* at ¶ 26. It was no coincidence that a "lender" created a subsidiary with a name nearly identical to the name of its "borrower" at the same time as it leant money. It is apparent, DSS's plan was always for the RBC assets to get distributed amongst its several subsidiaries. After DSS obtained control of RBC's assets, RBC International also knowingly entered into fraudulent documents purporting to transfer, at arm's length, RBC's assets, including its multilevel marketing services, RBC USA's common stock, and RBC's intellectual property, to RBC International. *Id.* at ¶¶ 47-49. Nothing was paid to RBC in return. *Id.*

Ultimately, DSS was the mastermind and beneficiary of the Enterprise's overall scheme. As detailed in the Complaint, DSS's primary goal in the transaction was to benefit from RBC's developed presence in Asia. *Id.* at ¶¶ 23-24.  Through the scheme, DSS acquired, among a host of other valuable assets, RBC's sophisticated multilevel marketing infrastructure in the Asian market. *Id.* Once DSS assumed control of RBC, DSS, through Heuszel at its helm, then furthered the scheme by initiating a series of criminal and fraudulent activities to legitimize its de facto merger with RBC. *Id.* at ¶¶ 31-42, 47-49, 50-53, 55-56. DSS placed Price, its consultant for direct sales in international markets, as acting CEO of RBC to further its transition of control. *Id.* at ¶¶ 25, 29. DSS formed multiple entities to support its takeover of RBC and to continue operations with RBC's assets for free, including HWH and RBC International. *Id.* Further, DSS

structured the Decentralized and Bliss Notes and subsequent foreclosures and RBC International's agreements with RBC to manipulate the timing of its de facto acquisition of/merger with RBC – acquiring millions in assets for free. *Id.* at ¶ 56.

## B.   Defendants' Racketeering Activities.

Over the course of at least three and a half years, the Enterprise embarked on a series of predicate acts to further the scheme. The scheme was to accomplish a merger while at the same time avoiding creditors and misleading investors. Effectuating the scheme required a series of discrete predicate activities.

- Through the Decentralized Note, the Bliss Note, the Decentralized Proposal, the Bliss Proposal and subsequent foreclosure sale, the Consulting Services Agreement, and the Intellectual Property Licensing Agreement, RBC, Brown, and Howard transferred control of all of RBC's millions of dollars' worth of assets to DSS, Heuszel, Decentralized, HWH, and RBC International, at a time when RBC was insolvent, without the DSS Defendants paying any money to RBC in exchange, in violation of TUFTA. *Id.* at ¶¶ 31-42, 47-55.

- Through wire or mail communications, DSS, Decentralized, HWH, RBC, and Brown documented the Decentralized Note, Decentralized Security Agreement, Bliss Note, and Bliss Security Agreement, putting up all of RBC's assets as collateral, even though Brown acknowledged that RBC had no intent or ability to repay the purported loans. *Id.* at ¶¶ 31-42.

- Through wire or mail communications, DSS, RBC International, RBC, and Brown formalized the transfer of RBC's assets to RBC International through the Consulting Services Agreement and the Intellectual Property Licensing Agreement, for no payment in return, and even though the assets were already transferred. *Id.* at ¶¶ 47-49.

- Months later, DSS, Decentralized, HWH, RBC, and Brown formalized the transfer of RBC's assets to Decentralized and HWH through compromise agreements and foreclosures, communicated through wire or the mail, even though all of the assets were already transferred. *Id.* at ¶¶ 50-53.

- Thereafter, DSS, Decentralized, and HWH communicated with banks and creditors, through wire and mail, and asserted that their fraudulently obtained security interests in RBC's assets were legitimate to avoid garnishments and general liabilities to creditors. *Id.* at ¶¶ 54-55, 61, 89.

- Through multiple public filings with the SEC, DSS misrepresented the nature of the transaction to assume total control of RBC, without payment to RBC and cutting out RBC's creditors, to mislead investors and potential investors of the status of the publicly traded company. *Id.* at ¶¶ 56, 61.

Defendants committed each of these acts in furtherance of the overall scheme permitting DSS and its subsidiaries to assume control of RBC's assets; Defendants to avoid RBC's liabilities; and DSS to manipulate its public disclosures. In further detail, Defendants' fraudulent course of conduct in furtherance of the scheme, includes the following:

1. ***RBC moved all of its assets to DSS in violation of TUFTA.***

Defendants DSS, Heuszel, RBC, Brown, and Howard orchestrated the scheme to transfer all of RBC's assets, worth millions of dollars, at a time when RBC was facing known, secured creditors like Blue Elephant and Digital Media Group, and soon to be creditors like Maiden. *Id.* at ¶¶ 20-21. In October 2019, all of RBC's assets were moved to the DSS umbrella. *Id.* at ¶¶ 27-28. The intent of the transfer was to defraud RBC's secured and looming creditors. Additionally, these Defendants agreed, or acquiesced, that RBC would receive nothing in payment in exchange for the transfer of all of its assets, again knowingly leaving RBC's creditors with nothing to satisfy RBC's outstanding liabilities.

2. ***Decentralized and HWH acquire RBC's assets through fraudulent promissory notes and subsequent compromise agreements and a foreclosure sale.***

The Defendants needed to paper DSS' assumption of control to give it the sheer of legitimacy. They first accomplished this with the creation of two similar promissory notes, entered between RBC and Decentralized on October 9, 2019 for $200,000 and RBC and HWH ("Bliss") on November 11, 2019, for an $800,000 line of credit (the "Decentralized Note" and the "Bliss Note," respectively). *Id.* at ¶¶ 33, 35, 38-39. These notes similarly pledged all of RBC's millions of dollars' worth of assets as collateral. *Id.* And the proceeds of the notes, if any,

were transferred into RBC's operating account, already controlled by DSS, for the sole purpose of creating the illusion of lawful transfers. *Id.* at ¶¶ 36, 42.

Thereafter, Decentralized and HWH sent proposals to RBC claiming that it "defaulted" on the notes and offered a "credit" for $115,000 and $100,000, respectively, in exchange for accepted collateral of *all* of RBC's valuable assets (the "Decentralized Proposal" and the "Bliss Proposal"). *Id.* at ¶¶ 50, 52. However, for months DSS was already exercising control of these assets in exchange for no payment made to RBC. *Id.* at ¶¶ 52-53.

Only upon objection to the Bliss Proposal by another secured creditor of RBC, Blue Elephant, did HWH opt "in an abundance of caution" to conduct a public foreclosure sale of RBC's assets subject to the Bliss Note. *Id.* at ¶ 54. On April 23, 2020, Heuszel was the only bidder present at the "public" foreclosure sale, and his bid, on behalf of HWH, of $150,000 was accepted in exchange for RBC's millions of dollars' worth of assets. *Id.* at ¶ 55.

### 3. *RBC International acquires RBC's assets through sham agreements.*

After creating the fraudulent promissory notes, Defendants devised similar arrangements for RBC International – specifically created to continue RBC's business – to "formally" acquire RBC's assets. On December 3, 2019, RBC and RBC International executed the Consulting Services Agreement whereby RBC International formally acquired access to all of RBC's multilevel marketing support services, arguably the most lucrative asset in the scheme, for free. *Id.* at ¶ 47. However, RBC International had been utilizing these services for free since its inception. *Id.* Also pursuant to this agreement, RBC International acquired 100% of RBC USA's Capital Stock for the alleged payment of $200,000 to RBC. *Id.* at ¶ 48. However, there is no evidence any actual consideration was paid under this agreement. *Id.*

Contemporaneous with the Consulting Services Agreement, RBC and RBC International

executed an Intellectual Property License Agreement whereby RBC International was granted a license to use all of RBC's intellectual property worth millions in value. *Id.* at ¶¶ 43, 49.  Again, RBC International already benefited from RBC's intellectual property and there was no consideration even contemplated under this agreement. *Id.* at ¶ 49.

　　　　After DSS assumed control for no payment in return, Defendants papered Decentralized, HWH, and RBC International's acquisition of the assets through the agreements explained above to give the illusion of a legitimate transfer. Additionally, beginning on September 25, 2019 and continuing through at least September 15, 2020, DSS transferred money back and forth between its bank account, its subsidiaries HWH and RBC International's bank accounts, and RBC USA's bank account (controlled by DSS) to further the impression that RBC was being paid through those agreements, and thus for its assets, at arm's length. *Id.* at ¶¶ 30, 89. Upon information and belief, these payments are ongoing as DSS, Decentralized, HWH, and RBC International continue to utilize RBC's assets. *See* ¶ 89.

### 4.　*DSS' Defendants oppose RBC's secured creditors' interests.*

　　　　At the outset of the scheme, Defendants agreed to cut out DSS' known creditors, including Blue Elephant and Digital Media Group, following failed negotiations to resolve their secured interests. *Id.* at ¶ 44. DSS Defendants also ignored Maiden and allowed its lawsuit to enter default against RBC in December 2019 while they simultaneously engaged in the fraudulent efforts detailed above. *See id.* at ¶¶ 44, 58. It was not until Maiden initiated post-judgment collection efforts pursuant to its over five million dollar judgment against RBC when DSS, HWH, and Decentralized began to interfere with Maiden's efforts. In June 2020, Decentralized asserted its alleged superior interest in funds held in RBC USA's bank account with Prosperity Bank. *Id.* at ¶ 89. Decentralized urged Prosperity Bank to reject Maiden's

garnishment action for the funds therein pursuant to the Decentralized Proposal, even though it had no enforceable lien on the account. *Id.* Also, in November 2020, Decentralized and HWH intervened in Maiden's underlying lawsuit against RBC by again asserting an alleged secured interest in RBC's assets, based on the Decentralized Proposal and the sham foreclosure sale, in attempt to preclude Maiden's post-judgment collection efforts. *Id.*

### 5.    *DSS' Fraudulent Representations to Harm Other Third Parties.*

Finally, the DSS Defendants, with the assistance of RBC, Brown, and Howard, structured the Decentralized Note, the Bliss Note, the corresponding security agreements, the Consulting Services Agreement, the Intellectual Property License Agreement, and the subsequent partial satisfaction proposals and foreclosure, to benefit DSS, a publicly traded company and the ultimate beneficiary from this scheme, in manipulating the timing of its public disclosure of the de facto acquisition of RBC. *Id.* at ¶ 56. These manipulations include, at a minimum, DSS' Form 10K to the SEC on or around December 31, 2019, representing DSS' purported acquisition of RBC's assets through promissory notes and foreclosures at dates later than its assumption of control for free. *See id.* at ¶ 89.

In sum, all of these efforts stem from Defendants' scheme to allow DSS Defendants to operate with the benefit of RBC's assets, which continues today, and for all Defendants to escape RBC's liabilities.

### III.
### ARGUMENTS AND AUTHORITIES

### A.    Applicable Legal Standard for Federal Rule of Civil Procedure 9(b) and 12(b)(6) Motion to Dismiss.

Rule 8 of the Federal Rules of Civil Procedure requires that a plaintiff plead "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P.

8(a)(2).  A claim will survive an attack under Rule 12(b)(6) if it "may be supported by showing any set of facts consistent with the allegations in the complaint" and pleads "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 546, 570 (2007).  "[D]etailed factual allegations" are not required. *Id.* at 555.  Instead, a pleading need only be "factually suggestive beyond mere conclusory allegations." *Fugett v. DCP Midstream, L.P.,* 2:14-CV-00111-J, 2015 WL 510965, at *2 (N.D. Tex. Feb. 6, 2015).

In analyzing a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court accepts all well-pleaded facts as true and views them in the light most favorable to the plaintiff. *See Thompson v. City of Waco, Texas*, 764 F.3d 500, 502 (5th Cir. 2014).  Further,  because  "a Rule 12(b)(6) motion is viewed with disfavor and rarely granted, a complaint may not be dismissed unless it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Leleux v. United States*, 178 F.3d 750, 754 (5th Cir. 1999) (emphasis in original) (internal quotation marks omitted).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  FED. R. CIV. P. 9(b).  The particularity demanded by Rule 9(b) necessarily differs with the facts of each case.  *Hart v. Bayer Corp.*, 199 F.3d 239, 248 (5th Cir. 2000). The purpose of Rule 9(b) is to "provide defendants with adequate notice of the nature and grounds of the claim," *Id.* at n.6; *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994).  However, "[i]n ruling on a Rule 9(b) motion, the Court must still 'accept as true the well-pleaded factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff.'"  *Womack v. Nissan N. Am., Inc.*, 550 F. Supp. 2d 630, 637 (E.D. Tex. 2007) (quoting *Herrmann Holdings, Ltd. v. Lucent Techs., Inc.*, 302 F.3d

552, 557 (5th Cir. 2002)).

Maiden's Complaint provides sufficient short, plain statements where applicable, and otherwise, the requisite details of DSS Defendants' multiple fraudulent acts to put the defendants on notice of Maiden's well plead claims. Maiden's Complaint more than satisfies the applicable pleading standards.  Accordingly, DSS Defendants' Motion should be denied.

**B.     Maiden Has Stated a RICO Claim Against DSS Defendants.**

       *1.     Summary of Maiden's RICO allegations against DSS Defendants.*

Congress enacted RICO with the express purpose of "curb[ing] the infiltration of legitimate business organizations by racketeers."  Pub. L. No. 91–452, 84 Stat. 922 (1970).  The RICO statute prohibits (1) the investing of monies earned through racketeering activities in an enterprise engaged in interstate commerce; (2) using proceeds from the collection of an unlawful debt to make a similar investment; (3) conducting an enterprise through a pattern of racketeering activity; and (4) conspiring to violate any of the above prohibitions. *See* 18 U.S.C. §§ 1964(c) and 1962(a)–(d).[1]  The foregoing RICO claims require both the existence of "a pattern of racketeering activity" and "an enterprise."  *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988), *cert. denied*, 489 U.S. 1079 (1989); *Orthoflex, Inc. v. ThermoTek, Inc.*, 3:11–CV–0870–D, 2012 WL 2864510, at *2 (N.D. Tex. July 12, 2012).

Maiden plead that DSS Defendants, along with RBC, Brown, and Howard, organized with the joint purpose of misappropriating RBC's assets, investing the fraudulently acquired assets in DSS and its subsidiaries, manipulating public disclosures, and ultimately enriching themselves at the expense of RBC's creditors, including Maiden, pursuant to a fraudulent

---

[1] While Maiden did not expressly state a claim for § 1962(c)-(d) in its Complaint, it sufficiently plead facts to support Defendants' liability for these prohibited acts. To the extent the Court believes expressly identifying those provisions is required, Maiden seeks leave to amend and add references to those provisions.

scheme over a period of time. *See* [Dkt. 1], ¶¶ 23-59, 61-62, 78-103.  Indeed, this scheme is precisely the type of conduct that RICO was enacted to eradicate and that courts have held sufficient to state cognizable claims under RICO. *Reuther v. Smith,* Civ.A. 01-3625, 2002 WL 1303119 (E.D. La. June 12, 2002) (denying defendant's motion to dismiss based on plaintiff's sufficient pleading of defendants' actions in fraudulently diverting funds, manipulating the timing of subject transactions for tax purposes, and taking over subject corporations for the financial benefit of defendants at the expense of plaintiff and other shareholders); *Tujague v. Eckerd,* 4:18-CV-00408, 2018 WL 3376967 (E.D. Tex. July 11, 2018) (finding plaintiff prevailed on his motion for preliminary injunction on his RICO claim by demonstrating that defendants engaged in numerous acts to divert millions of dollars to defendants' shell companies specifically created for the purpose of receiving the fraudulently diverted funds); *Willbros Int'l, Inc. v. Tillery*, CV H-08-3725, 2009 WL 10700118 (S.D. Tex. June 17, 2009) (holding plaintiff plead sufficient facts in support of its RICO claim alleging that defendants participated in a scheme to divert funds through sham consulting agreements with various companies owned in whole or in part by defendant); *Dale v. Frankel,* 131 F. Supp. 2d 852 (S.D. Miss. 2001) (denying defendant's motion to dismiss plaintiff's RICO claim upon finding sufficient pleading of defendant's actions in obtaining control of subject companies, placing defendant's associates in positions of authority of such companies, and then stealing money from the subject companies through financial transactions made payable to defendant's newly created sham companies).

Because Maiden has plead facts sufficient to show the existence of a "pattern of racketeering activity" and an "enterprise," in support of its claims against Defendants for violating, §§ 1962(a)-(d) of RICO, DSS Defendants' Motion should be denied.

**PLAINTIFF'S RESPONSE TO DSS DEFEDANTS' MOTION TO DISMISS**                    **Page 13**

2.      **Maiden has properly alleged a "Pattern of Racketeering Activity."**

To constitute a "pattern of racketeering activity," a defendant must commit two or more "predicate acts" within a 10-year period that are "related" and have "continuity." *Id.* at § 1961(5). Congress defined "racketeering" broadly to include the violation of a number of state and federal offenses—referred to as "predicate acts"—enumerated in 18 U.S.C. § 1961(1). Predicate acts that are expressly enumerated are: (1) mail fraud; (2) bank fraud; (3) wire fraud and (4) violations of state law, including state common law. *Id.* at § 1961(1); *Cadle Co. v. Schultz*, 779 F. Supp. 392, 399 (N.D. Tex. 1991).

      a.   <u>Maiden has sufficiently alleged Defendants' predicate acts that constitute mail fraud and wire fraud.</u>

The elements necessary to establish wire fraud and mail fraud are essentially identical, so courts apply identical analyses to the mail and wire fraud statutes. *Carpenter v. United States*, 484 U.S. 19, 25 n. 6 (1987). To establish a predicate act of mail fraud, a plaintiff must show: "(1) the defendant participated in some scheme or artifice to defraud; (2) the defendant or someone associated with the scheme used the mails or 'caused' the mails to be used; and (3) the use of the mails was for the purpose of executing the scheme." *Cadle Co.*, 779 F. Supp. at 398–99 (citing 18 U.S.C. § 1341). The elements are the same for wire fraud, "except that the second element involves the 'use of, or cause the use of, wire communications in furtherance' of the scheme." *United Healthcare Services, Inc. v. Next Health, LLC*, 3:17-CV-00243-E-BT, 2021 WL 764035, at *10 (N.D. Tex. Feb. 26, 2021) (citing 18 U.S.C. § 1343).

The language of the mail fraud and wire fraud statutes are broad enough to encompass any conduct that fails to reflect "moral uprightness, ... fundamental honesty, fair play and right dealing in the general and business life of members of society.'" *Cadle Co.,* 779 F. Supp. at 399,

n.37 (internal quotations omitted). Further, schemes to fraudulently transfer assets are schemes to defraud in violation of the mail and wire fraud statutes. *Id*. at 399. Meaning under Fifth Circuit precedent, a violation of TUFTA constitutes fraud redressable under the mail and wire fraud statutes as well. *Id*. at 399, 401 (holding that plaintiff sufficiently plead facts about the scheme of the fraudulent transfer of assets to avoid paying a judgment, using mail and wires in connection with the scheme, to support a violation of TUFTA, and thus, the presence of a pattern of racketeering activities in support of a RICO claim). Finally, mailings and wires need not make affirmative misrepresentations, but rather, communications that attempt to lessen the suspect appearance of a fraudulent transaction will violate the respective statutes. *Id*. at 400.

To allege a mail fraud and wire fraud predicate act, a plaintiff must comply with Rule 9(b)'s pleading requirements. *United Healthcare Services, Inc.*, 2021 WL 764035, at *10. However, mail and wire fraud are broad crimes, and Rule 9(b) only requires a plaintiff to delineate, with adequate particularity, the specific circumstances of the overall fraudulent scheme. *Id.* (citing *Metals Co. v. Chazanow*, No. 3:09-cv-808-B, 2009 WL 3853704, at *5–6 (N.D. Tex. Nov. 17, 2009). Once membership in a fraudulent scheme is established, a knowing participant is liable for any mail or wire communication that subsequently takes place or which previously took place in connection with the scheme. *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 675 (5th Cir. 2015).

Here, Maiden sufficiently plead details of the formation of Defendants' scheme to fraudulently takeover RBC's assets at a time when it was insolvent. The scheme involves a series of fraudulent transfers and related activities to effectuate DSS' assumption of control, to manipulate DSS' public disclosures, and to disadvantage RBC's known and soon to be creditors. Maiden sufficiently plead details of Defendants' actions in using mails and wire communications

to further the fraudulent takeover, including:

- Transmitting the Decentralized Note and Decentralized Security Agreement in or around October 9, 2019, in support of the fraudulent transfers of RBC's assets, via email and/or U.S. mail. [Dkt. 1], ¶¶ 27-28, 30, 31-37, 89.

- Transmitting the Bliss Note and Bliss Security Agreement in or around November 11, 2019, in support of the fraudulent transfers of RBC's assets, via email and/or U.S. mail. *Id.* at ¶¶ 27-28, 30, 38-42, 89.

- Transmitting the UCC-1 statements for the Decentralized Note and Decentralized Security Agreement on October 14, 2019 and October 18, 2019, to the Office of the Secretary of the State of Nevada, in support of the fraudulent transfers of RBC's assets. *Id.* at ¶¶ 31-37, 89.

- Transmitting the UCC-1 statements for the Bliss Note and Bliss Security Agreement on November 21, 2019, to the Office of the Secretary of the State of Nevada, in support of the fraudulent transfers. *Id.* at ¶¶ 38-42, 89.

- Beginning on September 15, 2019, transmitting at least thirty-four wire transfers between DSS', and its subsidiaries HWH and RBC International's bank accounts to RBC USA's bank account, through at least September 15, 2020, for a total of at least $811,667.18 in funds for the purpose of continuing the façade that there were legitimate arms' length loan transactions occurring pursuant to the Decentralized Note and the Bliss Note. *Id.* at ¶¶ 27-28, 30, 31-42, 89.

- Transmitting the Consulting Services Agreement, allowing RBC International to fraudulently gain unfettered access to RBC's assets and acquire RBC USA's stock for no consideration in return, on or around December 3, 2019, via email and/or U.S. mail. *Id.* at ¶¶ 27-28, 30, 47-48, 89.

- Transmitting the Intellectual Property License Agreement, allowing RBC International to fraudulently gain license rights to RBC's intellectual property for no consideration in return, on or around December 3, 2019, via email and/or U.S. mail. *Id.* at ¶¶ 27-28, 30, 49, 89.

- Transmitting the Decentralized Proposal, allowing Decentralized to fraudulently acquire RBC USA's assets for a purported "credit," via U.S. Mail on January 24, 2020, and the subsequent executed agreement to the proposal via email and/or U.S. mail on February 7, 2020. *Id.* at ¶¶ 27-28, 30, 50-51, 89.

- Transmitting the Bliss Proposal, allowing Bliss to fraudulently acquire RBC and RBC's Subsidiaries' assets for a purported "credit," via U.S. Mail on February 10, 2020, and the subsequent executed agreement to the proposal via email and/or U.S. mail on February 7, 2020. *Id.* at ¶¶ 27-28, 30, 52-53, 89.

- Emails between Brown, Howard, and Heuszel on December 19 and 23, 2019, acquiescing in RBC's withdrawal of counsel in the Maiden lawsuit against RBC and the eventual multi-million dollar judgment against RBC, while simultaneously permitting DSS Defendants' fraudulent takeover of RBC's assets for free. *Id.* at ¶¶ 27-28, 30, 58-61, 89.

- Transmitting DSS' Form 10-K to the SEC on or around December 31, 2019, asserting misrepresentations regarding the fraudulent transfers made pursuant to the Decentralized and Bliss Notes and the subsequent foreclosure proceedings, to manipulate the timing of DSS' assumed control of RBC's assets. *Id.* at ¶¶ 27-28, 30, 56, 89.

- Transmitting DSS' periodic reporting to the SEC, in the form of its annual Form 10-K (for the fiscal year ending December 31, 2020), its quarterly Form 10-Qs, and/or its current Form 8-K, after assuming control of RBC's assets in October 2019, with manipulated information of the timing of the acquisition. *Id.* at ¶¶ 27-28, 30, 56, 89.

- Emails between Heuszel, Howard, and Price on February 28 and March 2, 2020, agreeing to ignore Maiden's default judgment against RBC based on DSS' alleged secured interest in RBC's assets obtained through fraudulent transfers. *Id.* at ¶¶ 27-28, 30, 58-61, 89.

- Transmitting the Decentralized Security Agreement and Bliss Security Agreement on May 15, 2020, via U.S. Mail, claiming a security interest in RBC's assets, obtained through fraudulent transfers, and attempting to interfere with Maiden's post judgment collection efforts of its judgment against RBC. *Id.* at ¶¶ 60, 89.

- Emails from counsel for Decentralized to Prosperity Bank on or around June 2-3, 2020 asserting a false representation of an alleged secured interest in RBC's assets, obtained through a fraudulent transfer, and requesting Prosperity Bank reject Maiden's garnishment action based on the false representation. *Id.* at ¶¶ 60, 89.

- Transmitting Decentralized and HWH's Motion for Intervention in Maiden's underlying lawsuit on November 2, 2020, asserting representations of Decentralized and HWH's alleged secured interest in RBC's assets, fraudulently obtained, and attempting to interfere with Maiden's post judgment collection efforts. *Id.* at ¶¶ 60, 89.

- Transmitting Decentralized and HWH's Opposition to Maiden's Third Application for Turnover Order of RBC's assets in Maiden's underlying lawsuit on January 12, 2021, asserting representations of Decentralized and HWH's alleged secured interest in RBC's assets, fraudulently obtained, and attempting to interfere with Maiden's post judgment collection efforts. *Id.* at ¶¶ 60, 89.

Each of these actions, through mail and wire communications, were made to further, directly or indirectly, the scheme of fraudulently transferring RBC's assets to DSS and its subsidiaries, at a time RBC was insolvent, to manipulate DSS' public disclosures, and to cut out RBC's creditors.

Accordingly, the details of Defendants' fraudulent transfers in violation of TUFTA also qualify as predicate acts in the form of mail and wire fraud to support Maiden's RICO claims.

      b.  <u>Maiden has sufficiently alleged Defendants' predicate acts that constitute bank fraud.</u>

To establish a claim for bank fraud, a plaintiff must show a person knowingly executed or attempted to execute a scheme to defraud a financial institution. 18 U.S.C. § 1344. Not only does Maiden sufficiently plead that Decentralized's correspondence to Prosperity Bank violates the broad wire and mail fraud statutes, but further, the correspondence additionally violates the bank fraud statute. *See id; see also* 18 U.S.C. §§ 1341, 1343. Maiden plead that Decentralized falsely asserted to Prosperity Bank that it had a properly secured interest in RBC's accounts with the bank in an effort to persuade Prosperity Bank to reject Maiden's garnishment action. [Dkt. 1], ¶ 60, 89. As detailed in the Complaint, there was no such security interest. Based on this assertion, Decentralized attempted to interfere with Maiden's post-judgment collection efforts and prevent Maiden from obtaining the funds it garnished from RBC's account pursuant to its multi-million dollar judgment against RBC. *Id.* Decentralized ultimately withdrew its objection, but its ***attempt*** to interfere and defraud Prosperity Bank is sufficient for liability purposes under the bank fraud statute, and thus, to constitute a predicate act in support of Maiden's RICO claims.

      c.  <u>Maiden met its burden under Rule 9(b) in providing sufficient facts to put Defendants on notice of its RICO claim.</u>

DSS Defendants claim that Maiden fails to satisfy the particularity requirements to support Maiden's claims of mail fraud, wire fraud, and bank fraud. *See* [Dkt. 24], ¶ 24. DSS Defendants point to only one example, the predicate act of Defendants engaging in at least thirty-four wire transfers, and argue that Maiden's Complaint is "entirely devoid of any details as to who made the transfers, when the transfers were made, the content of the allegedly fraudulent

statement made in connection with the transfers, and what if anything, was obtained as a result of the allegedly fraudulent statements." *Id.* This argument is misplaced. Maiden has sufficiently provided the requisite details of the bank transfers, including the timeframe, the location of and owner of the bank accounts involved, the total amount of funds transferred back and forth between the entities, importantly, for the purpose of funding DSS Defendants' takeover of RBC's assets. *See* [Dkt. 1], ¶ 26-30, 89. Like all predicate acts, Maiden is not required to plead the time, date, amount, and account number for every instance of mail, bank, and wire fraud conducted by DSS Defendants. *See Cypress/Spanish Ft. I, L.P. v. Professional Service Industries, Inc.*, 814 F. Supp. 2d 698, 711 (N.D. Tex. 2011).  Instead, Maiden must only plead facts showing DSS Defendants' contribution to the overall RICO scheme, which Maiden has sufficiently done – as outlined above.  *See id.* Also, Maiden detailed far more predicate acts than just the movement of money.

In fact, a strikingly similar argument to the one advanced by DSS Defendants was found "unconvincing" by this Court in *Cypress/Spanish Ft. I, L.P.*  In that case, the defendant argued the charged mail and wire fraud claims were deficient because the plaintiff had allegedly "failed to identify any specific reports, summaries, or other documents sent through the mail or by wire for purposes of furthering a fraudulent scheme." *Id.* at 712.  In rejecting that argument, this Court held that the "focal point" of a court's inquiry into the sufficiency of such pleadings is "whether the pleading satisfies the purposes of [Rule 9(b)]." *Id.*  This Court held that the purpose of Rule 9(b) was met because the defendant was properly put on notice by the plaintiff's complaint in generally identifying the time period the alleged frauds were perpetrated, the location, the nature of the fraud, how the participants profited from the conspiracy, and the parties involved.  *See id.*

Similarly here, Maiden has met the purpose of Rule 9(b)—as it applies in pleading fraud as a predicate act to a RICO violation—by pleading the requisite details of the bank transfers and the numerous other predicate acts in furtherance of the scheme. These allegations are legally sufficient to effectively put DSS Defendants on notice of the basis of Maiden's claims.

> d. DSS Defendants' litigation activities are predicate acts that further support Maiden's RICO claim.

DSS Defendants also argue that the inclusion of Decentralized and HWH's interference with Maiden's post-judgment collection efforts as a predicate act is improper. *See* [Dkt. 24], ¶ 25. DSS Defendants' reliance on *Snow Ingredients, Inc. v. SnoWizard, Inc.* in support of this argument is misplaced. 833 F.3d 512 (5th Cir. 2016). In *Snow Ingredients, Inc.,* the Fifth Circuit explained that as a matter of first impression, it was asked to review whether bad faith litigation ***alone*** could support a civil-RICO claim. *Id.* at 525. The court concluded that without evidence of actual criminal activity, the claim on its own was not a predicate offense for RICO. *Id. Snow Ingredients, Inc.* is distinguishable here because in addition to the predicate acts involving HWH and Decentralized's interference with Maiden's post-judgment efforts, Maiden has plead a multitude of other acts supporting actual criminal activity outside of the litigation context. Therefore, the inclusion of the litigation-related acts is appropriate.

> e. Maiden sufficiently plead details regarding the "related" nature of Defendants' predicate acts.

Contrary to DSS Defendants' claim that Maiden plead only one fraudulent scheme, the predicate acts outlined above and detailed in the Complaint support a "pattern of racketeering activity." Maiden plead sufficient details of Defendants' multiple criminal actions, with multiple victims, all interrelated for achieving the purpose of Defendants' fraudulent scheme. *See H.J., Inc. v. Nw. Bell Telegraph Co.*, 492 U.S. 229, 239 (1989) (finding predicate acts are "related"

where the acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and not isolated events"). For example, Maiden plead sufficient details regarding DSS' fraudulent acquisition of all of RBC's assets for free after failed negotiations with Blue Elephant and Digital Media. [Dkt. 1], ¶ 44. This initial criminal act led to DSS' subsidiaries utilizing fraudulent promissory notes and agreements to paper their assumption of control over RBC's assets and defraud RBC's known creditors and soon to be creditors like Maiden. *Id.* at ¶¶ 31-42, 47-49. Similarly, HWH utilized a fraudulent foreclosure sale to wipe out creditor Blue Elephant's secured interest in RBC's assets. *Id.* at ¶¶ 54-55. From these series of fraudulent engagements, DSS was then able to include false representations of the timing of its acquisition of RBC, harming investors and unknown third parties. *Id.* at ¶ 56. Also, Decentralized asserted misrepresentations of its alleged secured interest in RBC's assets to Prosperity Bank, directly impacting the bank and Maiden's post-judgment collection efforts. *Id.* at ¶ 89. These examples of separate actions, in addition to the multitude of others in the Complaint, demonstrate a series of interrelated acts all aimed at goal of DSS seizing control of RBC's assets while disadvantaging RBC's creditors and manipulating DSS' public disclosure requirements.

     f.   Maiden sufficiently plead details regarding the continuous nature of Defendants' racketeering activities.

Continuity means either repeated past criminal activity (a closed period of conduct) or threatened long-term criminal activity (an open period of conduct). 18 U.S.C. § 1961(5); *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989); *Cypress/Spanish Ft. I, L.P.*, 814 F. Supp. 2d at 713 (citations omitted); 18 U.S.C. § 1961(5). "Factors that a court considers in determining whether continuity exists are length of scheme, including the threat of it continuing indefinitely;

number of separate transactions, participants, or victims; and geographic scope." *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 662 (S.D. Tex. 2016) (citing *Abraham v. Singh*, 480 F.3d 351, 356 (5th Cir. 2007)).  Maiden has sufficiently plead both an open and closed period of conduct in support of its RICO claims.

"A closed period of conduct may be properly pled by alleging 'a series of related predicates extending over a substantial period of time.'" *Cypress/Spanish Ft. I, L.P.*, 814 F. Supp. 2d at 713 (quoting *H.J., Inc.*, 492 U.S. at 242–43).  However, the Fifth Circuit has not specifically addressed the length of time sufficient to impose RICO liability. *ABN-AMRO Mortgage Group, Inc. v. Mikel*, A-04-617-LY, 2005 WL 8155229, at *3 (W.D. Tex. Dec. 12, 2005), report and recommendation adopted, A-04-617-LY, 2006 WL 8432137 (W.D. Tex. June 8, 2006).  Here, at a minimum, Maiden plead activity beginning in October 2017 extending through January 2021. *See* [Dkt. 1], ¶¶ 27-28, 30-56, 58-61, 89. Within this length of time, Maiden has identified various forms of wire fraud, bank fraud, and mail fraud, at the hands of DSS Defendants and the other Defendants Brown, RBC, and Howard, spanning the United States, including Nevada, Texas, New York, and outside of the United States in the fraudulently acquired Asian infrastructure, and impacting multiple victims, including Maiden, Blue Elephant, Digital Media, Prosperity Bank, and DSS' investors. *See id.; see also id.* at ¶¶ 21, 57, 64-65. Considering all of these factors within this closed period of criminal activity, Maiden sufficiently met its burden of establishing continuity of a pattern of racketeering activity.

Alternatively, an open period of conduct refers to either a "'specific threat of repetition extending indefinitely into the future," or "where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business.'" *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996) (citing *H.J. Inc.*, 492 U.S. at 242-43).

Today, DSS Defendants, through subsidiaries Decentralized, HWH, and RBC International, operate multiple legitimate businesses with the benefit of RBC's fraudulently acquired assets. For example, RBC International was specifically devised to continue the ongoing business of RBC and sell its products under the DSS umbrella. *See* [Dkt. 1], ¶ 26, 47-49. Also, HWH was formed in October 2019 to start a new direct sales company utilizing RBC's products, fraudulently acquired, and continues to benefit from the assets. *Id.* at ¶¶ 38-42, 45, 52-56. In addition, Decentralized fraudulently acquired all of RBC's assets and continues to utilize these assets. *Id.* at ¶¶ 26, 33-37, 45, 50-51. The continuous nature of the racketeering is further evidenced by Decentralized and HWH's actions to interfere with Maiden's post-judgment collection activities, as recently as January of this year, pursuant to their representations of security rights – fraudulently obtained – in RBC's assets. *Id.* at ¶ 89. As each of these DSS subsidiaries continues to operate with the fraudulently acquired assets of RBC, to the benefit of themselves, DSS, and Heuszel, and to the disadvantage of RBC's known creditors, the racketeering activities are open-ended and continuous.

### 3.    *Maiden has properly alleged the existence of an "Enterprise"*

"Enterprise" is defined broadly to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact, although not a legal entity." *See* 18 U.S.C. § 1961(4).  Congress gave the term a broad reach to where even the smallest fish, or those peripherally involved with the enterprise, may face liability. *Commercial Metals Co. v. Chazanow*, CIV.A. 309-CV-0808-B, 2009 WL 3853704, at *8 (N.D. Tex. Nov. 17, 2009) (citing *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.1978)). An association-in-fact enterprise must have a (1) purpose, (2) relationships associated with the enterprise, and (3) longevity sufficient to permit the associates to pursue the enterprise's purpose.

*Commercial Metals Co.*, 2009 WL 3853704, at *8 (finding plaintiff sufficiently plead an association-in-fact enterprise in claiming that the defendants' purpose was to direct business opportunities and profits to an entity controlled by the defendants; the defendants collaborated regarding the scheme; and the operation was continuous throughout the time frame alleged). Individuals with limited involvement can still be implicated within an enterprise if they acted toward the shared goal of the scheme. *Plambeck*, 802 F.3d at 674.

DSS Defendants incorrectly contend that Maiden's Complaint is "devoid of facts that would support continuity, hierarchal structure, or consensual decision making within the alleged 'enterprise.'" *See* [Dkt. 24], ¶ 36.  This is without merit. Heuszel, Brown, and Price's actions alone, on behalf of the Defendant entities, in executing numerous fraudulent documents in support of the scheme are more than sufficient pleading of consensual decision making. *Id.* at ¶¶ 31-42, 47-49. Indeed, the Complaint includes numerous allegations regarding each Defendants' direct or indirect participation and collaboration in the enterprise's affairs in furtherance of the Defendants' scheme, including:

- Defendant Heuszel's negotiations with RBC, Brown, and Howard for DSS to acquire RBC. *Id.* at ¶¶ 23-24.

- DSS' formation of RBC International and Bliss International, Inc. (HWH) to continue the ongoing business of RBC once it fraudulently acquired RBC's assets.  *Id.* at ¶ 26.

- DSS' seizure of control of RBC's assets without paying anything to RBC in return. *Id.* at ¶ 27.

- DSS' placement of David Price, consultant for DSS, as acting CEO of RBC and RBC USA, to further facilitate its assumption of control. *Id.* at ¶ 29.

- DSS, HWH, and RBC International's transfers to RBC USA's bank account to fund DSS operations of RBC USA. *Id.* at ¶ 30.

- DSS, HWH, and RBC International's acceptance of wire transfers from RBC as profits from their operations of RBC. *Id.*

- DSS, Decentralized, Heuszel, RBC, and Brown's entry to the Decentralized Note and Security Agreement, pledging all of RBC's assets as collateral, with the understanding that RBC could never repay the note when it was due one month later. *Id.* at ¶¶ 31-37.

- DSS, HWH, Heuszel, Brown, and RBC's entry to the Bliss Note and Security Agreement, a convertible or demand note, that pledged all of RBC's assets as collateral, with the understanding that RBC could never pay any demand for repayment asserted. *Id.* at ¶¶ 38-42.

- Heuszel, Brown, and Howard's agreement to let the Maiden lawsuit enter default while simultaneously allowing DSS, HWH, RBC International, Decentralized, and Heuszel to seize all of RBC's assets without paying for them. *Id.* at ¶ 44.

- Brown, RBC, and RBC International's entry to the Consulting Services Agreement, providing RBC International with full access to RBC's multilevel marketing services and full ownership of RBC USA's stock, without payment in return. *Id.* at ¶¶ 47-48.

- Brown, RBC, and RBC International's entry to the Intellectual Property License Agreement, granting RBC International unfettered access and use of RBC's intellectual property, without payment in return. *Id.* at ¶ 49.

- Heuszel, DSS, Decentralized, and RBC's entry to the Decentralized Proposal, agreeing to Decentralized's acquisition of RBC's assets for no payment in return. *Id.* at ¶ 50.

- Heuszel, DSS, HWH, Brown, and RBC's entry to the Bliss Proposal, agreeing to Decentralized's acquisition of RBC's assets for no payment in return. *Id.* at ¶ 52.

- DSS' acceptance of Heuszel's bid, on behalf of HWH, for all of RBC's assets, without any payment for the assets made. *Id.* at ¶ 55.

All of these actions sufficiently implicate each Defendants' participation in various interrelated acts all for the purpose of permitting DSS Defendants to obtain control of RBC's assets, at the expense of known creditors, while avoiding DSS' public disclosure requirements. Finally, the actions listed above and described in further detail in the Complaint establish the longevity of the enterprise to continue to operate with the use and benefit of RBC's fraudulently acquired assets today. Consequently, Maiden has properly alleged the existence of an enterprise in support of its RICO claims.

Maiden's allegations that DSS Defendants violated RICO go well beyond the necessary threshold to overcome DSS Defendants' Rule 9(b) and 12(b)(6) Motion to Dismiss.  For all of these reasons, DSS Defendants' Motion to Dismiss for failure to state a claim should be denied.

**C.      Maiden Has Stated a Claim Against DSS and RBC International under TUFTA.**

Maiden has plead sufficient facts to establish that DSS and RBC International violated TUFTA. To state a claim for an actual fraudulent transfer, a plaintiff must establish that a debtor transferred assets shortly before or after a creditor's claim arose with actual intent to hinder, delay, or defraud any of the debtor's creditors. *Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir. 2019). To state a claim for a constructive fraudulent transfer, a plaintiff must establish a transfer for lack of reasonably equivalent value in exchange and the transferor was 'financially vulnerable' or insolvent at the time of the transaction. *Id.* Under these theories, both '"the first transferee of the asset or the person for whose benefit the transfer was made' may be held liable for such transfer." *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 265 (5th Cir. 2016) (quoting TEX. BUS. & COMM. CODE § 24.009(b)(1)). Maiden has sufficiently plead a violation of TUFTA against RBC International and DSS.

*1.      DSS benefited from the fraudulent transfer of RBC's assets as a Transferee under TUFTA.*

Maiden sufficiently plead facts that support its claims that DSS, at the hands of its CEO Heuszel, orchestrated this scheme along with the other Defendants to benefit DSS and expand its global reach in the Asian market. When a person's actions result in more than just an incidental or indirect benefit from a fraudulent transfer, then the person qualifies as a transferee for purposes of TUFTA. *Esse v. Empire Energy III, Ltd.*, 333 S.W.3d 166, 181 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (finding that individuals' actions in assenting to and

benefiting from fraudulent transfers were sufficient to hold them liable under TUFTA).

Here, DSS' actions more than support a finding that it was not only a direct beneficiary of the fraudulent transfers of RBC's assets, but further, it directed, assented, and directly reaped the benefits of such transfers. DSS' actions in furtherance of the transfers, at a minimum, include:

- Heuszel, on behalf of DSS, opened negotiations with Howard regarding acquiring RBC's multilevel marketing infrastructure in the Asian market with the knowledge that RBC was insolvent. [Dkt. 1], ¶¶23-24.

- DSS formed subsidiaries to take over RBC's assets, including Bliss International, Inc. (HWH) and RBC International. *Id.* at ¶ 26.

- DSS' newly created subsidiaries, RBC International and HWH, and Decentralized took control of RBC's assets without paying anything to RBC. *Id.* at ¶¶ 27, 30.

- DSS arranged for David Price, its consultant in international markets, to be named acting CEO for RBC while DSS, and its subsidiaries, assumed control. *Id.* at ¶ 29.

- DSS allowed the Maiden lawsuit against RBC to enter default while it simultaneously assumed control of RBC's assets. *Id.* at ¶¶ 44, 57-62.

- DSS directed or assented to Decentralized, HWH, and RBC International's execution of the Decentralized Note, the Bliss Note, the Consulting Services Agreement, the Intellectual Property License Agreement, and the subsequent partial satisfactions and foreclosure sale, respectively, in attempt to legitimize its takeover of control of RBC's assets. *Id.* at ¶¶ 61-62.

- DSS manipulated its public disclosures with the SEC of the timing of its acquisition of RBC. *Id.* at ¶¶ 41, 89.

From the outset of the initial negotiations between DSS and RBC, DSS directed, and orchestrated the transfers of RBC's assets to its subsidiaries (which all appear to share or overlap in use and benefit from RBC's assets) in violation of the mail and wire fraud statutes to achieve its goal of reaching the Asian market. In contrast to DSS Defendants' allegation, DSS' involvement in the fraudulent transfers extends beyond its relationship as a parent company. *See*

[Dkt. 24], ¶¶ 45-46. Accordingly, Maiden has sufficiently plead that DSS is a transferee and a beneficiary of the fraudulent transfers under TUFTA, and the Motion should be dismissed.

       *2.*    ***RBC International benefited from the fraudulent transfer of RBC's assets as a Transferee under TUFTA.***

       Maiden's Complaint also sufficiently supports the claim that RBC International is a beneficiary and transferee of the fraudulent transfers because it was created for the sole purpose of receiving and utilizing RBC's fraudulently acquired assets. A receiver is liable under TUFTA when they are the person for whose benefit the transfer was made. *Janvey,* 840 F.3d at 265. Maiden sufficiently plead that DSS created RBC International to benefit from the fraudulent transfer of RBC's assets and engaged in multiple criminal acts in violation of the mail and wire fraud statutes to complete the transfers. [Dkt. 1], ¶ 26. Indeed, this is evidenced by the Consulting Services Agreement, documenting RBC International's acquisition of RBC's multilevel marketing support services and 100% of RBC USA's capital stock, which RBC International enjoys, for free. *Id.* at ¶¶ 47-48. Further, this is evidenced by the Intellectual Property License Agreement, whereby RBC International acquired the unfettered use of RBC's intellectual property for no consideration in return. *Id.* at ¶ 49. Maiden has provided sufficient detail that RBC International is a transferee and directly benefited from the fraudulent transfer of RBC and RBC USA's assets; therefore, DSS Defendants' Motion should be denied.

**D.**    **Maiden Has Stated a Claim for Unjust Enrichment.**

       Maiden's Complaint clearly establishes its entitlement to recover for unjust enrichment against DSS Defendants under Texas law. "A key element of unjust enrichment is that the person sought to be charged wrongly secured or passively received a benefit." *Clapper v. Am. Realty Inv'rs, Inc.,* 3:14-CV-2970-D, 2016 WL 302313, at *14 (N.D. Tex. Jan. 25, 2016) (Fitzwater, J.). "A party may recover under the unjust enrichment theory when one person has obtained a benefit

from another by fraud, duress, or the taking of an undue advantage." *Id.* (denying defendants motion to dismiss on plaintiff's unjust enrichment claim based on plaintiff's sufficient pleading that defendants currently possessed fraudulently transferred property).

Here, Maiden's unjust enrichment claim properly relies on the theory that DSS Defendants have obtained RBC's assets by fraud. [Dkt. 1], ¶¶ 57, 61-62, 70-74. The Defendants devised a scheme to permit DSS Defendants to take RBC's millions of dollars' worth of assets at a time when RBC was insolvent and facing multiple creditors, including Maiden; to assume control of such assets without paying a dime; and then to paper the transaction to give it the sheer of validity. *Id.* Also, DSS Defendants continue to benefit from these assets today to the disadvantage of RBCs multiple creditors.

Thus, contrary to DSS Defendants' assertion, Maiden has established its entitlement to recover for unjust enrichment. *Clapper,* 2016 WL 302313, at *14. Accordingly, DSS Defendants' Motion should be denied.

**E.      Maiden Has Sufficiently Plead Support for an Award of Exemplary Damages.**

Exemplary damages are available as a remedy where a plaintiff sufficiently pleads a fraud claim. *Id.* at *15. Because Maiden has sufficiently supported its RICO and TUFTA claims against DSS Defendants, it is entitled to seek exemplary damages as a form of relief.

**IV.**
**CONCLUSION**

For all the foregoing reasons, Plaintiff respectfully requests that the Court deny the Motion and grant Plaintiff all other appropriate relief.

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By:    */s/ Sydnie A. Shimkus*
Jeffrey S. Lowenstein
State Bar No. 24007574
jlowenstein@bellnunnally.com
Randall K. Lindley
State Bar No. 12367300
rlindley@bellnunnally.com
Sydnie A. Shimkus
State Bar No. 24093783
sshimkus@bellnunnally.com

2323 Ross Avenue, Suite 1900
Dallas, Texas  75201
(214) 740-1400
(214) 740-1499 Telecopy

**ATTORNEYS FOR PLAINTIFF
MAIDEN BIOSCIENCES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 4, 2021, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification to all parties of record.

*/s/ Sydnie A. Shimkus*
Sydnie A. Shimkus

5825464_1.docx